THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WALTER HARRINGTON, JR., Defendant-Appellant.

(No. 73-93;

Second District—September 24, 1974.

William E. Schirger and Jerrold R. Beger, of Schirmer, Schirger, Graff & Beger, of Rockford, for appellant.

Philip G. Reinhard, State's Attorney, of Rockford (James W. Jerz and Edward Morris, both of Model District State's Attorneys Office, of counsel), for the People.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

After a jury trial, defendant was convicted of the voluntary manslaughter of his wife and found not guilty of her murder. He was also found guilty of aggravated battery and not guilty of the attempted murder of one George Morehead. Defendant was sentenced to concurrent terms of 5-20 years in the penitentiary for manslaughter and 3-5 years in the penitentiary for aggravated battery. He appeals, contending that he was not proven sane beyond a reasonable doubt and that prejudicial closing argument by the prosecutor deprived him of a fair trial.

The charges arose out of a shooting on March 3, 1972, at the apartment of George Morehead's sister. It is undisputed that defendant came up the back stairs of the apartment at approximately 10 P.M., shot at the doorknob with a .22-caliber pump rifle, kicked the door in, and entered the apartment where he found his wife, his small son, and Morehead. He fired until his gun was empty, killing his wife and wounding Morehead. He kicked Morehead several times in the face, took his son and returned by car to a friend's home where he called his mother-in-law and then the police.

At trial, defendant sought to prove that he fired in self-defense and also offered the defense of insanity. (Ill. Rev. Stat. 1971, ch. 38, par. 6—2(a).) On appeal defendant does not raise the issue of self-defense, but claims that he was not proven sane beyond a reasonable doubt and that the prosecutor made prejudicial remarks in closing argument.

Defendant first argues that the testimony of two psychiatrists that defendant was not criminally responsible for his conduct at the time of the shootings was sufficient to raise a reasonable doubt as to his sanity; and that the testimony was not impeached by the lay witnesses offered by the State in rebuttal.

Dr. J. G. Graybill, a psychiatrist, testified for the defense. He stated that he first met defendant on April 26, 1972, saw him four times in all, and examined a report of a psychologist to whom he referred defendant. Dr. Graybill related defendant's history substantially in accordance with defendant's own testimony at the trial. Defendant was 22 years old at the time of the trial; was born in Mississippi and had 16 brothers and sisters and half-brothers and half-sisters; and grew up in Waterloo, Iowa, where he excelled academically and in sports in high school. He also met his wife there and went together all throughout high school with her. After high school they got married, and defendant went to Wartburg College on a football scholarship. His second year in college his wife became pregnant and because of complications with the baby, the defendant's wife had to stop her work and the defendant had to quit school

and get a job. They got deeply in debt, defendant was laid off and creditors were bothering them. They then moved to Rockford where defendant found a job with the Chrysler plant. He bought furniture on credit, but then injured his knee and was hospitalized for surgery.

On the basis of his interviews with defendant, Dr. Graybill learned that defendant considered himself almost ugly in grade school; that defendant thought attainment in other fields was necessary for him to compensate; and that defendant's wife emphasized her need for more luxurious surroundings causing defendant to purchase on credit. At the time defendant was hospitalized just prior to the Christmas before the shooting, defendant heard that his wife was carrying on an affair with George Morehead, but at first refused to believe this. When he came out of the hospital he confronted his wife who had first denied, but then admitted that she had been seeing George Morehead. This affected him emotionally. He did not believe in divorce and tried to discuss the situation with his wife and all concerned. His wife was undecided and put the defendant out of the house, but defendant could not stay away from his wife and son. About this time defendant filed bankruptcy. He was harassed by George Morehead who, defendant's friends had told him, was armed and intended to do him harm. Defendant was informed that Morehead was saying threatening things about him and on one occasion was followed by Morehead in a car.

On March 3, defendant borrowed $5 from his wife to play pool and drink beer and his wife told him she was going shopping. Because it was snowing defendant became worried about her absence when she did not return. He borrowed a car to look for her and because he knew George Morehead didn't live far from where he was going and that Morehead had threatened to shoot him, defendant got his rifle. Defendant testified that he didn't remember anything following the shooting incident until he ran into a pole with his son in the car; then he gradually remembered the incident. However, in a statement made by defendant to police which was introduced into evidence, defendant failed to indicate a loss of memory but rather stated that when he saw Morehead and his wife together he flew into a rage.

Dr. Graybill further testified that the defendant in relating the incident of the shooting was extremely self-condemning. This caused the doctor to diagnose his condition as severe depression, to change his medication, and to inform the jail of possible suicide.

The doctor gave an opinion that on March 3, based on defendant's history and the clinical examination concurred in by the psychological examination, the defendant lacked the capacity to appreciate the criminality of his acts or to conform his behavior to the requirements of the

law. The doctor referred to the March 3 incident as an acute psychotic episode or an acute rupture of the ego functions. He stated that psychiatrically the ego is that function which permits an individual to perceive reality and react appropriately to the realistic situation. If an individual is overburdened by stress and is unable to defend himself against this stress he retreats to a lower level and loses contact with reality which may result in an assaultive or physical violence. When his hemeostasis balance is regained the individual may return to a relatively normal pattern of action; ego rupture may be very temporary with prompt restoration of normal function. The doctor stated that ego rupture is an extremely common occurrence. He concluded that defendant had been put through a succession of stresses and the night of March 3 was the final stress which caused the defendant to totally break from reality for a brief period.

On cross-examination, the doctor stated that the facts which defendant had told him were not otherwise verified so that the diagnosis was dependent upon the truth of the facts related to him by defendant. The doctor characterized defendant's actions as stemming from a mental disease, but stated that defendant manifested no prior serious symptoms of a mental disease. When asked if defendant were weak in ego strength, the doctor replied that the defendant is very vulnerable to protracted stress "as we all are," and that prior to the shooting incident defendant's ego strength was being eroded by the constant stress in which he was placed. When questions as to Dr. Meninger's five common threads in cases of episodic discontrol [1] as being present in defendant's case, the doctor gave negative, equivocal or uncertain answers on all five. The doctor also answered that if two 250-pound policemen had been present when defendant entered Morehead's apartment, they might have acted as sufficient control to prevent defendant from shooting.

Dr. Carl Hamann, a psychiatrist, also testified for the defense. He offered his opinion from his findings and the history of the defendant that on the evening of March 3, 1972, the defendant was probably suffering, or at least defendant's behavior was consistent with, an acute reactive psychotic episode and that it was conceivable, in a reasonable degree of accuracy, that defendant was suffering from an acute episodic reactive depression or psychosis which negated his criminal responsibility (as that term is defined in the Criminal Code). .

---

[1] The prosecutor indicated these five common threads were: a) faulty control over aggressive impulses; b) severe degree of sexual inhibition; c) emotional deprivation and parental violence in early life; d) loneliness, having only shallow relationships with others; e) transient-moods of depression.

When cross-examination was directed to his use of the term "conceivable," the doctor said it was more probable than not probable that defendant was not criminally responsible. He stated that an acute reactive psychotic episode is characterized by loss of the control of an individual, reality is not tested in its usual way, one's judgment is impaired, and one does not react or behave in the usual controlled manner. The episode could vary from a short time to a prolonged period of time, and people are prone to episodes such as defendant exhibited who have altered ego structures and lots of other personality deficits. The defendant manifested an early history of ego weakness and problems, but there was no evidence of a history of psychotic depression, activities, or episodes prior to March 3 that the doctor knew of from the defendant. The doctor explained defendant's episode was caused by a crescendo of many life-threatening events.

The doctor stated that his diagnosis was consistent with the behavior of the defendant both before and after the shooting based on what he had obtained in the way of case history from the defendant and also based on observing the defendant and reading between the lines. At the time the doctor examined the defendant, some weeks after the event of March 3, the defendant was in a deep suicidal depression. When asked if what happened was a case of someone violently losing his temper, the doctor said that part of one's behavior in a disorganized fashion could be described in a term of anger, or it also could be described in many other terms.

A detective, Charles Jackson, testified for the prosecution that when he answered the call to go to the apartment of a Jesse O'Neil, defendant was holding his son on his lap and a gun was on a bed near where he was sitting. No attempt was made to hide the gun and the defendant indicated that the gun was the one involved. In the squad car the defendant asked, "Are they dead yet?" When informed at police headquarters of his wife's death, the defendant broke down and cried for half an hour.

George Krebs, a detective, testified for the State that in escorting defendant to headquarters, the defendant stated, "If only she had stayed away from me, I wouldn't have done this." The witness testified that when he saw the defendant on March 3, 1972, from about 10:30 P.M., the defendant was coherent, calm, slightly nervous, had full understanding where he was and what he was doing and good recall in detail. The witness stated that some of his duties in the past 6 years involved experiences with some 12 to 14 people a year with mental problems. He expressed an opinion that when he saw the defendant, the defendant was not suffering from a mental disease or defect which would

make him incapable of appreciating the criminality of his conduct or conforming his conduct to the requirements of law.

William Francis, a policeman, testified that he was with the defendant about 20 minutes shortly after defendant called about the shooting. He had 13 years of experience with persons with mental problems to the extent of about 10 such people a year. Defendant appeared calm, answered intelligently, his thoughts did not stray and he appeared normal. In the witness' opinion the defendant did not appear to be suffering from a mental disease or defect to the extent that he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

Section 6—2 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 6—2(a)) provides:

> "Insanity. (a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

■■ All men are presumed to be sane. (*People v. Smothers* (1973), 55 Ill.2d 172, 174; *People v. Arnold* (1974), 17 Ill.App.3d 1043, 1049.) Once the defense introduces evidence of insanity, the presumption of the accused's sanity no longer prevails and the State must prove beyond a reasonable doubt that at the time of committing the crime charged, the accused was legally sane. *People v. Hawkins* (1972), 53 Ill.2d 181, 186.

The State, however, is not required to introduce explicit opinion testimony of the defendant's sanity in order to satisfy its burden of proof, but may satisfy its burden by other facts in evidence and by the opinion of nonexpert witnesses as to an individual's sanity based upon personal observations. (*People v. Smothers*, 55 Ill.2d 172, 174; *People v. Arnold*, 17 Ill.App.3d 1043, 1049.) The fact that there is no evidence of either prior mental treatment or prior irrational conduct is also of importance. *People v. Smothers*, 55 Ill.2d 172, 175.

The defendant contends that the State's rebuttal witnesses did not know the defendant prior to the offenses, but only through brief contact afterward; that the lay witnesses did not testify as to defendant's sanity at the time of the offenses and therefore did not contradict or impeach the testimony of the expert witnesses on the issue of insanity.

■■ On the whole record before us, however, the jury could properly have found that defendant's psychotic episode was a matter of anger and rage which resulted in violence stemming from the provocations he was facing. The jury was not required to accept as controlling the psychiatrists' conclusion that what they characterized as a reactive psychotic

episode or ego rupture was a mental disease or defect which would avoid criminal responsibility within the meaning of section 6—2(a) of the Criminal Code. (Ill. Rev. Stat. 1971, ch. 38, par. 6—2(a).) When asked if what happened with defendant was a case of someone violently losing his temper, Dr. Hamann said his behavior could be in part described in terms of anger as well as in many other terms. Dr. Graybill's description of ego rupture or loss of ability to perceive and react realistically and the consequent retreat to a lower level of assaultive or physical violence is consistent with anger or rage. Dr. Graybill noted that the episode may be very temporary and that it is an extremely common occurrence. Defendant's own statement to police characterized his conduct as that of rage.

In *People v. Miller* (1965), 33 Ill.2d 439, 443, psychiatric testimony which indicated that defendant had a personality disorder, formed unrealistic judgments and was unable to evaluate situations that faced him was held to fall far short of establishing a mental disease or mental defect within the meaning of the statute. Similarly in *People v. Lono* (1973), 11 Ill.App.3d 443, 449, the court found that even though the State offered no rebuttal evidence, the record justified the court's conclusion that defendant was sane. The court noted that evidence that a defendant has been disturbed in mind and excited does not justify reasonable doubt of sanity; nor does evidence of idiosyncratic behavior, irresponsible conduct, personality disorders, unrealistic judgments, the commission of atrocious crimes, or an alleged lapse of memory which is otherwise not related to insanity. See also *People v. Smothers*, 55 Ill.2d 172, 175; *People v. Moore* (174), 19 Ill.App.3d 334, 339-40; *People v. Ureste* (1972), 7 Ill.App.3d 545, 550-551.

■■ Under all of the circumstances in evidence we are not justified in overturning the jury's finding of sanity which is not manifestly against the weight of the evidence. See *People v. Ford* (1968), 39 Ill.2d 318, 321; *People v. Anderson* (1968), 104 Ill.App.2d 47, 54.

We must then reach defendant's further contention that remarks of the prosecutor in closing argument were a gross misrepresentation of the record and deprived the defendant of a fair and impartial trial.

In his closing argument defense counsel stated that the only evidence bearing on defendant's sanity was the testimony of the two psychiatrists and the two police officers. He then asked:

> "Would you want your life to depend upon the type of proof which the State has produced on the issue of insanity?
>
> Why hasn't the State come in this courtroom with a psychologist or psychiatrist?"

The State then objected, and the court ruled that the prosecutor could respond in argument. Defense counsel continued:

> "Why haven't they brought in someone to say that Walter Harrington is perfectly sane? Why haven't they? The only reason why they have not done so is because they could not come up with any contradictory testimony.
>
> *   *   *
>
> What testimony do we have other than the testimony of the two doctors? How can you say in this case there is no reasonable doubt concerning Walter Harrington's sanity when the only testimony is the testimony by the two psychiatrists and the State has produced no rebuttal testimony?"

Counsel shortly thereafter closed his argument and moments later the State's Attorney in the rebuttal argument said:

> "He says why have we not come in with a psychologist or psychiatrist. Well, it wasn't until the very morning of the trial, after I made a motion to the court—
>
> [Defense Counsel]: Your honor I am going to object   *   *   *.
>
> [The Court]: He may respond to the question raised in your argument within reason.
>
> [State's Attorney]: It wasn't until the morning of the trial, when I made a motion to compel the defendant to tell me what his defense was that I knew he was, in fact, going with insanity. Under the rules of discovery he originally filed, back I think about three months ago, a motion indicating his defense would be compulsion, necessity, self-defense and insanity, leaving me to determine which one it was. And there are other reasons as well."

■■ The State argues that its comment fell within the scope of fair rebuttal in answer to the challenge made in defense counsel's closing argument. (See *People v. Smith* (1962), 24 Ill.2d 198, 200; *People v. Lewis* (1962), 25 Ill.2d 442, 446.) We would agree that in this case the prosecutor could well respond to defense counsel's invitation for an explanation for the State's failure to bring in a psychologist or a psychiatrist in rebuttal. But the further inquiry must be made of whether the prosecutor gave a proper response, one that was a legitimate statement in answer to the defense argument. See *People v. Dukes* (1957), 12 Ill.2d 334, 342; see also *People v. Helm* (1973), 9 Ill.App.3d 143, 149-150; *People v. Hopkins* (1970), 124 Ill.App.2d 415, 419-420; *People v. Mwathery* (1968), 103 Ill.App.2d 114, 118-121.

An examination of the record reveals that on June 9, 1972, the defendant answered the State's motion for disclosure stating:

"Defendant wishes to rely upon the defense of Chapter 38, Article 4—3 mental state and 6—2, 7—13, 7—11, 7—1, 7—2 and 7—3 from Illinois Revised Statutes and subject to the general defenses as are necessary at the time of the trial."

On June 15, 1972, defense counsel informed the court and the State of a letter from Dr. Graybill stating that it was highly likely defendant could not cooperate in his defense and that he suffers from psychotic depression. A competency examination was requested and defense counsel informed the court that one of the defenses was going to be insanity. The State joined in the motion for a competency hearing and also filed a motion to compel defendant to submit to a psychiatric examination for the purpose of determining defendant's sanity as defined in section 6—2 of the Criminal Code, stating:

"The facts and circumstances of the crime with which the defendant is charged justify a reasonable belief that the defense of insanity may be raised by the said defendant, WALTER HARRINGTON, JR., at trial."

The court granted the motions and appointed Dr. Hamann and a Dr. Henry to make the examination as to defendant's sanity and appointed Dr. Graybill and a Dr. Hammal to conduct the competency examination. Reports were filed showing defendant competent to stand trial.

Defendant's list of witnesses filed September 21, 1972, included Drs. Graybill and Hamann. Further, at the pre-trial conference, the State's Attorney asked for more particulars of a defense and defense counsel affirmatively stated that he was using insanity. The trial thereafter commenced on September 25, 1972, and continued through September 29, 1972.

Given the background of the case of which the jury was ignorant, we must conclude that the prosecutor's remark constituted an incorrect and therefore improper response to defense counsel's comments on the lack of psychiatric testimony to support the State's case. The natural import of the prosecutor's remark would lead the jury to believe that defense counsel's reliance upon the defense of insanity at trial was a late-blooming strategy which took the State by surprise thereby explaining the prosecutor's failure to present expert rebuttal testimony. The true state of the record which was known to the prosecutor but unknown to the jury supported practically the opposite conclusion. The prosecutor knew or should have known well before trial that defense counsel intended to use and probably would use the insanity defense. The prosecutor had sufficient time to arrange for expert testimony on behalf of the State in rebuttal at defendant's trial, if he so desired, and therefore misled the jury

948

in answering defense counsel's comment on the absence of expert testimony by the State.

■■ Although we do not sanction the method chosen by the prosecutor to answer defense counsel's queries, we do not thereby conclude that a new trial is warranted. The remark complained of constituted but one impropriety in an extended trial which filled three volumes of transcript. (*Cf. Donnelly v. DeChristoforo* (1974), 40 L.Ed.2d 431, 438, 94 S.Ct. 1868.) The prosecutor's statement, while misleading, was not totally so, since the prosecutor pointed out that defendant did file 3 months before trial an answer to discovery indicating an intention to rely on the insanity defense among others.

Defendant contends that the prosecutor's remark implied that defense counsel was resorting to trickery and attempting to confuse the issues. No explicit statements accusing defense counsel of deception were made, and as defense counsel states, the characterization would have to arise by implication. We do not deem the remarks here to have been of sufficient magnitude to have substantially prejudiced the defendant. No inflammatory language was used, and as is evident from the report of the trial proceedings, the jury must have been aware that defense counsel was making a conscientious attempt to present the defense of insanity. The cases cited by defendant to sustain his claim of prejudice (*People v. Berry* (1960), 18 Ill.2d 453; *People v. Freedman* (1954), 4 Ill.2d 414; *People v. Polenik* (1950), 407 Ill. 337) all involve remarks which compare neither in scope nor degree to the remark here under consideration. See *People v. Woodley* (1965), 57 Ill.App.2d 380, 384-386.

Finally, it is our considered opinion that had the error complained of been omitted the jury could not have returned a verdict more favorable to the defendant. The jury acknowledged its sympathy with defendant's position by returning verdicts of voluntary manslaughter and aggravated battery instead of murder and attempted murder in circumstances which could have easily justified convictions on the latter more serious offenses. (Compare, *e.g., People v. Arnold* (1974), 17 Ill.App.3d 1043.) The motive of the crimes was obvious, one which readily forms an evidentiary basis for murder and voluntary manslaughter convictions. The defendant lacked any prior record of aberrational behavior, and his behavior after the crime was also normal according to rebuttal testimony. Even the psychiatrist's description of episodic discontrol and ego rupture supported a finding of anger, and defendant's statement to police characterized his own conduct in shooting his wife and Morehead as one of rage when he saw them together.

Our research has uncovered no cases which have found insanity or even considered the case close on the issue of insanity where, as here,

the nature and motive of the crime are not unusual and the defendant has manifested no aberrational behavior either before or after the crime. As we have pointed out, precedents of this State require a stronger showing than was made here to raise a reasonable doubt that defendant was suffering from a mental disease or defect sufficient to avoid criminal responsibility within the meaning of section 6—2 of the Criminal Code; and it is not reasonable to assume that the properly instructed jury would have been prejudiced by the prosecutor's remark so as to affect the verdict. The improper response by the prosecutor did not constitute reversible error.

The defendant has also complained that the following comment by the prosecutor in closing argument was improper and prejudicial:

"Ladies and gentlemen, we hear complaints today about courts and the law and crimes and the degree of permissiveness that is involved in all areas of our society. You are here in this case. You are part of this court structure. You represent the conscience of the community, you and each of you do. You may become part of the permissiveness of this society by saying that this man was temporarily insane and finding him not guilty or you may enforce the law as it ought to be enforced by finding him guilty of murder."

No objection was made to the argument.

Defendant contends this remark falls beyond the bounds of urging fearless administration of the law; that it equates a finding of temporary insanity with permissiveness in our society; that the prosecutor was attempting to play upon the emotions and fears of the jury; that it went beyond the record; and that it was prejudicial because it sought to sustain the State's case at its weakest point through means that could not have aided the jury in weighing and evaluating the evidence.

Defendant cites *People v. Moore* (1956), 9 Ill.2d 224, but there the argument went far beyond what we have here, and the court there did not specifically condemn the part of the argument which defendant sets out in his brief and claims supports his position in this case. The other case cited by defendant is even less support for his position. See *People v. Halteman* (1957), 10 Ill.2d 74.

■■ Defendant concedes that the prosecutor may dwell on the evil results of crime and urge fearless administration of the law. (*People v. Ostrand* (1966), 35 Ill.2d 520; *People v. Halteman*, 10 Ill.2d 74.) In the instant case the prosecutor's comment was in the category of urging fearless administration of the law, *i.e.*, that it would be permissiveness in this case to find defendant temporarily insane. Although it would have been better if the prosecutor had made it clear that the permissiveness would stem from the lack of circumstances in this case justifying temporary in-

sanity rather than just the general permissiveness he referred to, in the absence of objection we will not find plain error resulting in prejudice. (*People v. Smothers*, 55 Ill.2d 172, 176; *People v. Pecora* (1969), 107 Ill. App.2d 283; *People v. Count* (1969), 106 Ill.App.2d 258.) Moreover, it should be noted that the prosecutor called for a murder conviction in the objected to argument and there were facts which could have readily supported such a conviction, but the jury chose to return lesser, manslaughter and aggravated battery, verdicts. It would thus appear from the record that the jury was not unduly influenced by the prosecutor's argument.

The irregularities complained of could not reasonably have affected the result. (See *People v. Berry*, 18 Ill.2d 453, 460.) The judgment is therefore affirmed.

Affirmed.

T. MORAN, P. J., and RECHENMACHER, J., concur.