THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SAMUEL JACKSON, Defendant-Appellant.

(No. 56677;

First District (2nd Division)—September 30, 1974.

Lawrence Stephen Galka, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Algis F. Baliunas, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE HAYES delivered the opinion of the court:

After indictment, Samuel Jackson, defendant, was tried before a jury, was found guilty of the murder of Clarence Jones, and was sentenced to a term of 15 to 20 years in the penitentiary. He appeals and presents the following issues:

(1) Did an instruction on motive tendered by the State and given to the jury, deprive defendant of a fair trial?

(2) Did the trial Court's refusal to give "clarifying" instructions on self-defense deprive defendant of due process and a fair trial?

(3) Was the evidence sufficient to prove guilt beyond a reasonable doubt?

(4) Did improper conduct by the prosecutor deprive defendant of a fair trial?

An adequate review of these issues in this case requires the presentation of a somewhat detailed summary of the evidence.

Caldonia Jones, the wife of the victim, testified as a life and death witness. When asked by the State what her family consisted of on 22 August 1970, defense counsel objected and was sustained. Nevertheless, the witness answered, "myself and six children." The court instructed the jury to disregard the statement.

Glennie Pugh, a maid at Presbyterian-St. Luke's Hospital under Clarence Jones' supervision, testified that on the morning of 22 August 1970 at about 2:45 A.M., she was working on the first floor of the pro-

fessional building of the hospital in the vicinity of the canteen area. Mr. Jones was in the canteen area standing next to one of the vending machines and mopp'ng a rubber mat. Defendant, dressed in street clothes rather than in work clothes, then appeared in the lobby area and walked through the doors that led into the canteen area from the lobby. Defendant was facing the witness, who had her back to Mr. Jones, when defendant stopped walking and stood in the doorway. The witness then heard defendant say to Mr. Jones, "I told you before when you pulled my card, goddamit." The witness was a few steps from defendant when she observed defendant reach toward his waistband with his right hand and pull a gun. At this point, the witness hollered "oh, no" and ran into an adjacent washroom. After she had entered the washroom, the witness heard two loud noises which were shots. A few minutes later the witness left the washroom and saw Mr. Jones lying on the rubber mat. Defendant was not present at that time.

Thomas Dailey, director of security for Presbyterian-St. Luke's Hospital, testified that he had picked up defendant's employee time card from underneath the body of Mr. Jones, after the shooting. The card was punched in at 9:39 P.M. on 21 August 1970. The time indicated on the punch-out column was partially obliterated by blood, but was some minutes after 12 midnight.

Dr. E. J. Shalgos, a coroner's pathologist, testified that Mr. Jones was struck by two or three bullets. One bullet entered the back web of the left arm and exited the anterior right chest; another bullet entered slightly below and toward the back of the left chest and exited the right chest. Dr. Shalgos stated that he did not want to imply that the victim had been shot directly in the back. When one bullet went through the body, the right arm had to be up; and when the other bullet was fired, the right arm had to be next to the trunk.

Johnny Willis, a houseman, testified that, on 22 August 1970 between 2:30 A.M. and 2:45 A.M., he was working on the third floor of the professional building of the hospital. At that time defendant came to him and inquired as to the whereabouts of Mr. Jones. The witness told the defendant that the last time he saw Mr. Jones, Mr. Jones was on the second floor. Defendant turned around, entered the elevator, and went down.

Louis Smith, an employee of the hospital, testified that on 21 August 1970 he was working in the hospital from 10 P.M. until 6 A.M. The witness was assigned by Mr. Jones, along with defendant, to work in the professional building. Around midnight, Mr. Jones asked Mr. Smith where the defendant was. The witness replied that he did not know. The witness next saw Mr. Jones around 2 A.M. in the professional build-

ing. Mr. Jones told him, "If you see Mr. Jackson tell him to go home, or either come to the office." Sometime after 2:30 A.M., the witness was on the first floor of the professional building in the lobby, outside the canteen area; he saw defendant get off the elevator. As defendant got off the elevator, the witness told him that Mr. Jones was in the canteen area. Defendant said nothing and walked past the witness toward the canteen area. Then the witness heard the defendant say: "Jones, why did you pull my card? You won't pull it anymore." The witness then heard two shots. The witness testified further that he did not hear any commotion or scuffling before the shots were fired. At the time of the shooting, the witness could not see into the canteen from his position in the lobby. He did not see defendant carrying a gun.

Other witnesses for the State testified as to the arrest of defendant, and as evidence technicians.

Irene Adent, a centrex operator for the hospital, testified for defendant. Her office is located next to the canteen area, with the door to her office opening into the canteen area. At approximately 2:45 A.M., on the night in question, the witness went out that door and crossed the hallway into a ladies' rest room. When she came out, she saw a clean-up man near the switchboard room door, mopping the black rubber padding in front of the vending machines in the hallway. She later learned that the clean-up man's name was Mr. Jones. When she came out of the rest room, the witness also saw a clean-up woman and her cart parked in front of the switchboard door, and a smaller man standing against the wall opposite the vending machines. She later learned that the smaller man, whose face she could not see, was the defendant. The two men were conversing. When the witness was going back into the switchboard room, her back was to the smaller man, and Mr. Jones was passing her. The witness then heard the first blast, turned, and saw a gun in the hand of the smaller man. She then jumped behind the switchboard room door.

On cross-examination the witness testified that she had stayed in the rest room 4 or 5 minutes. When she came out of the rest room, the larger man was standing, talking, and holding a mop in his hands, but she did not remember seeing the smaller man. The witness did not remember hearing anything unusual prior to the first shot, other than two people conversing. The first shot was fired as soon as the witness had crossed from the rest room to her door, no more than 60 seconds after she left the washroom. When the shot was fired, the witness was looking toward her door. She turned around and saw a hand and a gun. Altogether the witness heard a total of four shots.

Samuel Jackson, defendant, testified that on 21 August 1970 he

punched his time card and was to start work at about 10 P.M. At approximately 1:40 A.M. on 22 August 1970, defendant met his supervisor Mr. Jones, who told him he could go home because he had not been doing his work. The defendant testified that he was not angry over this encounter. The defendant went to his locker room, changed clothes, and then had lunch. At about 2:35 A.M. he went back to his locker to get a gun that he had kept in his locker for about 3 weeks. He wanted to take the gun home at that time because it was easier to get past the security guard at night without being searched. He put the gun in his pocket so that it was not exposed, and kept his hand on the handle.

The defendant testified further that, when he went to the time clock to punch out, his time card was not in the rack. Defendant then went to the professional building to locate Mr. Jones. Defendant saw Mr. Willis, who advised him that Mr. Jones might be on the second floor. Defendant then saw Mr. Smith, who told him that Mr. Jones was in the canteen.

Defendant went into the canteen area and saw Mrs. Pugh standing by her cart, and Mr. Jones mopping a rubber mat. Mrs. Pugh went into the washroom as he walked up. Mr. Jones was using a "stripper" cleaning solution on the mat. The defendant had previously gotten the solution on his hands, causing his hands to burn and itch. Defendant is blind in one eye and cannot see very well out of the other.

Defendant stood against the wall directly across from Mr. Jones, said good morning to Mr. Jones, and asked him at what time his card was punched out. Jones then raised the mop and charged defendant, saying, "I told you to get the hell out of here." Defendant turned his head to avoid being struck in the face with the mop. Defendant was surprised by a loud noise; the gun was in his hand, and he remembered pulling the trigger out of fear that the solution on the mop might get in his face and eyes. Defendant remembered two or more shots.

On cross-examination, the defendant stated that he had owned the gun for 3 years. There was no specific reason why he carried guns. The gun was loaded when he placed it in the locker. He also testified to having had "a shot" and a beer before coming to work.

Defendant's first contention on appeal is that the giving of Illinois Pattern Jury Instruction—Criminal No. 3.04 (1968), in this case constitutes reversible error. This instruction provides that the State is not required to prove a motive for the commission of the crime charged. Defendant's argument is based on the IPI Committee Note which follows the instruction and reads in part: "However, in the *Enright* case the Illinois Supreme Court observed (256 Ill. at page 234, 99 N.E. at page 941), 'If the People claim that a motive existed inducing the

commission of the act it must be proved, and, like any other circumstance, cannot be inferred * * *.' Accordingly, if the People adduce evidence tending to prove a motive and the prosecutor argues the circumstance of motive to the jury, this instruction should *not* be given." IPI—Criminal No. 3.04 (1968).

In this case, the State did adduce and argue motive evidence to counter defendant's claim of self-defense. The State introduced uncontradicted evidence that defendant had been told by Mr. Jones sometime prior to the shooting that he should leave work because he was not doing his work, and that Mr. Jones had apparently punched out defendant's time card before the end of the work shift, as he had done once before (an incident about which defendant had protested). The State in its closing argument raised this time card disagreement in arguing that defendant had "built-up animosity" and a "motive" to commit murder.

The State's contention that this instruction was proper is based on drawing a distinction between cases where the State uses motive evidence to establish the identity of the person committing the criminal act, and cases where the motive evidence is used to discredit defendant's claim of self-defense. The State concedes that the jury should not be instructed that motive need not be proved where the State uses motive to establish identity. However, in this case, the identity of defendant as the person doing the shooting is not in question. In *People v. Hobbs* (1966), 35 Ill.2d 263, 269, 220 N.E.2d 469, 472, a self-defense case, the court stated, "The shooting was admittedly intentional. Whether it was done in self-defense is to be determined not by what led up to the argument but whether decedent drew a knife putting defendant in fear of bodily harm sufficient to warrant his killing her. And in this theory the defendant had the benefit of and was fully protected under the instruction of the right of self-defense."

Although *Hobbs* appears to support the distinction between the use of motive evidence to discredit a self-defense claim and its use in establishing identity, it is not controlling on the issue presented herein. In *Hobbs*, the jury was instructed that the State is not required to prove motive, but the court addressed itself only to upholding the trial court's refusal of defendant's requested instruction to the effect that failure to show motive is a circumstance in favor of innocence. *Hobbs* did not address itself to the instruction in issue in this case.

The Illinois Supreme Court has recently given important sanction to the Committee Note to IPI—3.04 by citing the Note in holding it improper for the State to have commented during final argument on defendant's motive in a case where IPI—3.04 was given. (*People v. Man-*

*zella* (1973), 56 Ill.2d 187, 306 N.E.2d 16.) Although motive evidence in *Manzella* was not used for the purpose of discrediting defendant's self-defense claim, we believe that such motive evidence may be as critical to the jury's determination of guilt or innocence in a self-defense case as motive evidenec can be in establishing the identity of the wrong-doer. In determining whether a defendant acted in justifiable self-defense, a jury may, as a practical matter, attempt to test defendant's claim that he acted to protect himself, as against an assertion by the State that he acted out of some other motive. If the evidence that the State argues in rebutting a self-defense claim of defendant includes a motive to commit murder, then the State should not, in fairness, be entitled to an instruction that the State need not prove motive.

■■ We, therefore, hold that it was improper in this case for the jury to have been given IPI—3.04 where the State adduced evidence tending to prove motive and argued the circumstances of that motive to the jury.

However, like the *Manzella* court, we do not find that the giving of this instruction, under the circumstances of this case, constitutes reversible error, because the State's case does not rest upon the motive evidence. The critical evidence rebutting defendant's self-defense claim (as will be discussed later herein) is the testimony of Mrs. Pugh and Mr. Smith, which, convincingly establishes defendant as the aggressor and not the self-defender. The real thrust of the evidence adduced and argued by the State, in terms of quantity and persuasiveness, was independent of motive.

Defendant's second contention is that the denial of his tendered instructions 15, 12, 11, and 9, relating to the law of self-defense, was reversible error. IPI—Criminal No. 24.06 (1968), on self-defense, was given in this case. Illinois Supreme Court Rule 451(a) provides that IPI—Criminal instructions shall be used, unless they do not accurately state the law. If there is no IPI instruction on a subject on which the court determines that the jury should be instructed, the instruction given on that subject should be simple, brief, impartial, and free from argument. Defendant concedes that the IPI self-defense instruction given is accurate as far as it goes, but contends that it failed to inform the jury that the aggressor need not have an armed weapon before a self-defender could have a reasonable belief justifying his use of force intended or likely to cause death or great bodily harm.

■■ The IPI instruction on self-defense which was given does not state that the aggressor must have an armed weapon or a deadly weapon. The language of the instruction speaks to a reasonable belief that the self-defensive force is necessary to prevent imminent death or great bodily harm to oneself or a third person. The instruction does not

expressly or impliedly limit the instrumentalities by which such imminent death or great bodily harm may be threatened. Defendant's own theory of this case is that he was justified in shooting Mr. Jones because he reasonably believed that the mop carried by Mr. Jones was an instrumentality threatening great bodily harm. The self-defense instruction given was totally consistent with defendant's theory of the case.

As evidence, however, that his tendered instructions were necessary, the defendant interjects a colloquy which took place in chambers after the verdict. The record indicates that the judge at that time agreed with defense counsel that one juror had stated that he thought Illinois law required a man to make every effort to escape before he was entitled to act in self-defense. However, defendant's tendered instructions did not relate to the proposition that a party need not attempt to escape before he may invoke self-defense. The record further indicates that the allegation that some jurors had also stated in chambers after the verdict that they thought that self-defense applied only against one possessing an armed weapon was simply an assertion of defense counsel. In any event, the verdict of the jurors may not be impeached even by their own affidavits or testimony (*People v. Stacey* (1962), 25 Ill.2d 258, 184 N.E. 2d 866), much less by a mere allegation of defense counsel.

The third contention of defendant on appeal is that the evidence at trial was insufficient to prove guilt beyond a reasonable doubt. Defendant alleges that he shot Mr. Jones only because Jones had charged him with a mop which had been soaked with a substance which could blind defendant's one good eye and otherwise cause serious bodily harm. The principal evidence supporting the claim of self-defense is defendant's testimony that he was charged by decedent with a mop. There is also evidence that defendant had prior experience with the substance which he thought was on the mop, and therefore had some reason to believe that this substance was harmful. A post-mortem examination indicated that decedent must have had his right arm extended in a horizontal position in order to permit one of the bullets to have gone through his body. Mrs. Adent testified that, as she was returning to the switchboard room, her back was to defendant, and decedent, who had been mopping, was passing her. She did not testify that decedent went charging past her, nor did she say anything about the mop as decedent was passing her.

There is, however, sufficient testimony which, if believed by the jury, would support beyond a reasonable doubt a finding that defendant and not decedent was the aggressor. Glennie Pugh testified that she was facing and was close to defendant with her back to the decedent when defendant came walking toward decedent and said to him, "I told you

before when you pulled my card, goddammit." Defendant then reached into his waist area with his right hand and pulled out a gun. Mrs. Pugh then ran into a washroom a few steps away and heard a loud shot, followed by another. Her testimony, if believed, establishes that defendant had his gun out prior to any confrontation with Mr. Jones and that defendant was therefore not acting in self-defense.

Louis Smith's basic testimony is that he had heard defendant say, "Jones why did you pull my card? You won't pull it anymore." Mr. Smith then heard two shots. This testimony also indicates that defendant was the aggressor. That Mr. Smith did not see defendant with a weapon is not inconsistent with Mrs. Pugh's testimony. Mr. Smith was in the lobby, and it was only after defendant would have passed Mr. Smith, that Mrs. Pugh had seen defendant draw his weapon. Irene Adent testified to having seen and heard two men conversing as she came out of the ladies' rest room and was crossing the hallway in the canteen area to the switchboard room door, and then to having heard gun shots as she neared the door. She did not testify to anything that would specifically refute the testimony of Mrs. Pugh and Mr. Smith. While she did testify that decedent passed her as she was returning to the switchboard room, even that testimony does not specifically refute the testimony of Mrs. Pugh that Mrs. Pugh was standing a few steps away from and facing the defendant and with her back to decedent when she first saw defendant pull a gun; she did not testify that decedent passed her at that time. None of the three witnesses who were in the immediate vicinity at the time of the shooting testified to having heard a commotion or scuffling.

There is no reason to reverse the jury finding based on the determination of the credibility of defendant and the other witnesses. The postmortem report of decedent's having had his right arm raised is as consistent with the belief that defendant had first attacked decedent as it is with defendant's testimony that decedent had first attacked him. It need not be assumed that, simply because decedent had his right arm extended at the time he was shot, he was the aggressor.

In a self-defense case, it is the province of the jury to determine the credibility of witnesses and the weight to be given their testimony. A jury's verdict will not be disturbed unless contrary to the evidence or so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. (*People v. Johnson* (1969), 112 Ill.App. 2d 148, 251 N.E.2d 393.) The State's evidence in this case, if believed, supported the finding that defendant was guilty of murder.

Defendant's final contention is that improper conduct by the prosecutor deprived defendant of due process and a fair trial. The allegations

of improper conduct relate to three areas of concern: defendant's drinking; the reference by the victim's wife to the victim's family; and a reference to defendant's prior ownership and possession of guns.

■■ The prosecutor commented in his opening statement on a "drinking problem" of defendant, and then questioned one witness on direct examination as to defendant's prior use of alcohol. In order to warrant reversal, the comment and testimony complained of must be of such nature as to have influenced the jury in a manner that resulted in prejudice to the defendant. (*People v. Nemke* (1970), 46 Ill.2d 49, 263 N.E.2d 97.) There is no showing here that the said testimony and comment had such prejudicial effect. The matter was insignificant in the light of all the evidence.

The victim's wife testified, over an objection already sustained, that she had six children. The jury was instructed to disregard her statement. In his closing argument the prosecutor merely referred to the decedent as "a family man."

In *People v. Bernette* (1964), 30 Ill.2d 359, 371, 197 N.E.2d 436, 443, the Illinois Supreme Court stated:

> "From these cases has devolved the rule that where testimony in a murder case respecting the fact the deceased has left a spouse and family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence. In like manner, we have held that jury argument by the prosecution which dwells upon the decedent's family or seeks to relate a defendant's punishment to the existence of family is inflammatory and improper."

In this case, mention of the decedent's family was elicited incidentally over a sustained objection and the jury was immediately instructed to disregard it, and the prosecutor's closing argument neither dwelled on decedent's family nor sought to relate defendant's punishment to the existence of a family.

■■ Defendant testified on direct examination that he owned a gun and that he had used that gun to shoot decedent. Given this admission, the questioning of defendant upon cross-examination as to prior ownership of guns was not of such prejudicial nature as to warrant reversal. The jury already knew that defendant owned a gun; it was not prejudicially harmful for the jury to believe that he may have owned a gun for over 6 years (as was suggested at trial). The jury was instructed to dis-

regard the prosecutor's question as to whether gun collecting was defendant's hobby.

We conclude that defendant received a fair trial and was not substantially prejudiced in the eyes of the jury by the prosecutor's conduct. For the foregoing reasons, the judgment of conviction is affirmed.

Affirmed.

STAMOS and LEIGHTON, JJ., concur.