THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* OLIVER W. SIMS, Defendant-Appellant.

First District (4th Division) No. 61161

Opinion filed January 14, 1976.

Paul Bradley and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Linda Ann Miller, Assistant State's Attorneys, and Nell Minow, Law Student, of counsel), for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The defendant, Oliver W. Sims, was charged by indictment with three counts of murder, six counts of aggravated battery, three counts of attempted murder and five counts of attempted armed robbery. During a jury trial, three counts of aggravated battery, three counts of attempted murder and two counts of attempted armed robbery were dismissed on the State's motion. The jury rendered verdicts finding the defendant guilty of murder and of three counts of aggravated battery. The defendant was subsequently sentenced to serve prison terms of 14 to 20 years for murder and 3 to 9 years for each of the three counts of aggravated battery, such sentences to run concurrently.

On appeal, the defendant contends that (1) the State did not prove beyond a reasonable doubt that he was sane at the time of the incident and (2) the court's instruction to the jury on motive was improper.

A review of the record indicates that on the morning of October 29, 1972, the defendant was in his cousin's home watching television with some relatives and friends. He asked his cousins, Anthony and James Lyles and Albert Sims, his brother, Henry, and two friends, Earl Avery

and Richard McQueen, to go into a bedroom with him. Subsequent to all these individuals entering the room, the defendant asked them for $400 which he claimed was stolen from him. Although each individual denied having the money, the defendant picked up two guns and stated that he would shoot them if they did not return the money. After departing from the room for five minutes, the defendant returned and repeated his demand for the money. When each individual again denied possessing the fruits of such request, the defendant fired one shot into the wall and, after making another inquiry, he shot Albert Sims in the shoulder, Anthony Lyles in the leg, James Lyles in the stomach, and Henry Sims in the leg. Upon termination of his assault, the defendant proceeded to carry James Lyles to the porch and, when the police arrived, he accompanied Lyles to the hospital in a paddy wagon. At the hospital, the defendant informed the police that he was standing in front of the building when he heard shots. He stated further that he saw two men run out of the house and down the street. Subsequent to a telephone conversation with other police personnel, Officer Thomas Scherry, the police officer who questioned the defendant for ten minutes, placed him under arrest. The defendant was indicted by the grand jury on seventeen counts, including murder, attempted robbery, and aggravated assault.

At the trial, the defendant raised the defense of insanity to the shootings pursuant to section 6—2 of the Criminal Code. (Ill. Rev. Stat. 1973, ch. 38, par. 6—2). In response to the assertion of this affirmative defense, various individuals, which included several members of the defendant's family, the arresting officer and two psychiatrists, were called to testify as to the defendant's sanity before, during, and subsequent to the commission of the offenses on the day in question.

. The State called four of the surviving victims as witnesses. After giving their respective accounts of the shooting on direct examination, Anthony Lyles, Albert Sims, and Richard McQueen testified on cross-examination that based on their observations of the defendant, he was not in control of his conduct during the shooting. Lyles and McQueen also described the defendant's behavior during the two weeks prior to the shootings as well as in the hospital subsequent to the incident as strange and/or unusual in which he would talk to himself, stare at the ceiling and not respond when other individuals tried to converse with him. However, Albert Sims testified further that he had seen the defendant frequently prior to the shooting and did not notice anything unusual about him. Richard McQueen noted further that when he and the defendant were watching television, there was nothing unusual about his conduct. The defendant's brother, Henry, stated on cross-examination that he saw nothing unusual about his brother at the time of the shootings.

The State also called Officer Thomas Scherry who testified that during the ten minutes in which he observed the defendant at the hospital, he appeared nervous but did not seem to be suffering from a mental disease or defect.

Two psychiatrists, Drs. Robert Reifman and Ronald Shlensky, testified in behalf of the defense. Dr. Reifman, who interviewed the defendant for about an hour on April 6, 1973, found the defendant "in fairly good reality contact," but described him as apathetic, withdrawn, and quiet. He expounded that based on his examination, which included an analysis of the defendant's social history derived from his mother and the police report of the shootings as well as an evaluation of a battery of tests which were administered by a psychologist of the Psychiatric Institute of the Circuit Court of Cook County, the defendant was suffering from schizophrenia, paranoid type, in partial remission. Dr. Reifman also testified that the defendant informed him of the rationale behind the shootings, namely, to fulfill a religious obligation to cure his family of their drug addiction because they would not do so voluntarily. He further opined that in light of his examination, the defendant was unable to appreciate the criminality of his acts on October 29, 1972.

Dr. Ronald Shlensky, who, analogous to Dr. Reifman, examined the defendant for approximately an hour on June 26, 1973, also found the defendant "in good contact with reality." Although he did not administer any tests nor review any police or history reports and did admit that it was difficult to make a judgment about a person's mental state nine or ten months later, Dr. Shlensky concluded that the defendant had a psychosis on October 29, 1972, which could have interfered with his ability to distinguish right from wrong. He testified further that his diagnosis was made without conferring with Dr. Reifman, whom he had never met.

The defense also called the defendant's mother, Annie Laura Sims, and Freddie Mitchell, a minister, to testify about the defendant's conduct two weeks prior to the incident. Mrs. Sims stated that the defendant would sit around and just stare at the wall almost every day. She also testified that the defendant had a breakdown one week before the shooting and asked her to take him to a doctor. Freddie Mitchell indicated that the defendant came to his church every night during the two weeks prior to the shootings to seek the right religion because he "heard voices telling him things."

After hearing the testimony of all the witnesses, the jury found the defendant guilty of murder and three counts of aggravated battery. The trial judge entered a judgment upon the jury's verdict and subsequently sentenced the defendant to prison terms of 14 to 20 years for murder

and 3 to 9 for each of the three counts of aggravated battery, such sentences to be served concurrently.

■■ We first consider whether the defendant was proven sane at the time of the shooting beyond a reasonable doubt. According to section 6—2 of the Criminal Code, the affirmative defense of insanity is defined as follows:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." (Ill. Rev. Stat. 1973, ch. 38, par. 6—2)

While the law presumes all individuals to be sane (*e.g., People v. Moore,* 19 Ill.App.3d 334, 337, 311 N.E.2d 401, 403; *People v. Washington,* 18 Ill. App.3d 858, 310 N.E.2d 647 (abstract opinion)), it has been held that once the defense introduces evidence sufficient to raise a reasonable doubt of the defendant's sanity at the time of the alleged offense (*People v. Redmond,* 59 Ill.2d 328, 337, 320 N.E.2d 321, 326; *People ·v. Smothers,* 55 Ill.2d 172, 174, 302 N.E.2d 324, 326), the prosecution must prove his sanity at that time beyond a reasonable doubt. (*E.g., People v. Felton,* 26 Ill.App.3d 395, 398, 325 N.E.2d 400, 402; *People v. Harrington,* 22 Ill.App.3d 938, 944, 317 N.E.2d 161, 165.) It is well settled in Illinois that whether or not the prosecution has satisfied this burden of proof is a question for the trier of fact, whose determination will not be disturbed on review unless it is so palpably against the weight of the evidence as to indicate it was based on passion or prejudice. (*E.g., People v. Dread,* 27 Ill.App.3d 106, 113, 327 N.E.2d 175, 180; *People v. Jackson,* 116 Ill. App.2d 304, 314, 253 N.E.2d 527, 532-33.) Moreover the trier of fact must consider the totality of the evidence in deciding whether the defendant's sanity at the time of the commission of the offense has been proven. (*People v. Horton,* 29 Ill.App.3d 704, 710, 331 N.E.2d 104, 109; (*People v. Moore,* 19 Ill.App.3d 334, 338, 311 N.E.2d 401, 405.) In so doing, the trier of fact is entitled to weigh the testimony and to determine the credibility of witnesses, both experts and lay alike, without being obliged, as a matter of law, to accept the opinions of psychiatrists concerning the defendant's sanity at the time of the charged offense. *People v. Banks,* 17 Ill.App.3d 746, 755, 308 N.E.2d 261, 268.

Applying these legal precepts to the instant case, we believe that there was sufficient evidence in the record from which the jury could and did conclude that the defendant was legally responsible at the time of the

offense. In the first place, the jurors could find that the defendant's own conduct evinced that the criminal acts which he committed were not the product of a mental disease or defect, but reflected deliberate rational behavior. According to the testimony elicited from Albert Sims, Richard McQueen, Henry Sims, and Officer Scherry, there was nothing unusual about the defendant's conduct prior to, during, or subsequent to the shootings. Moreover, the defendant's conduct in first firing into the wall and then shooting four of the six individuals in the bedroom, one at a time, could have been construed by the jury as a deliberate effort by an angry, frustrated individual, who, through the initial use of scare tactics, followed by an attempt to inflict only slight physical injury, sought the return of the money that was allegedly stolen from him. The defendant's lucidity was further exemplified by his explanation of the incident to the police. As previously mentioned, the defendant stated, at the hospital, that he had been standing in front of the building when he heard shots and subsequently observed two men run from the building and down the street. This account of the matter in controversy amounted, in effect, to a standard alibi and, when considered with the other evidence, further buttressed the jury's justifiable conclusion that the defendant was sane.

■■ The defendant also places heavy emphasis on the testimony of the two psychiatrists as well as the State's absence in presenting any expert testimony on its own behalf. With regard to the latter contention, it must be remembered that the State is not required to introduce explicit opinion testimony of the defendant's sanity in order to satisfy its burden of proof, but may satisfy its burden by other facts in evidence and by the opinion of nonexpert witnesses as to an individual's sanity based upon personal observations. (E.g., People v. Harrington, 22 Ill.App.3d 938, 944, 317 N.E.2d 161, 165; People v. Arnold, 17 Ill.App.3d 1043, 1049, 309 N.E.2d 89, 93.) Moreover, the jury was not required to accept as controlling the psychiatrists' conclusions regarding the defendant's ability to discern the criminality of his act since medical evidence concerning sanity is not indispensable even where sanity is an issue. (People v. Ureste, 7 Ill.App.3d 545, 550, 288 N.E.2d 45, 48.) Rather, the weight to be given such expert opinions is measured in part on the factual details which each expert marshals in support of such opinion. People v. Greenfield, 30 Ill.App.3d 1044, 1048, 333 N.E.2d 36, 39.

■■ In the case at bar, based upon the time and nature of the psychiatric examinations, the different rationales given by the defendant for the shootings, and the psychiatrists' diagnoses themselves, it was obvious that such expert testimony was unpersuasive. As mentioned at trial, the examinations of the defendant by Drs. Reifman and Shlensky, which were

undertaken solely for the purpose of testimony, respectively took place six and eight months after the defendant shot the victims and lasted only an hour. Moreover, both psychiatrists drew their conclusions of the defendant's mental condition at the time of the incident from tests which they neither administered nor interpreted themselves. The plausibility of these examinations is further suspect in light of the divergent accounts of the shootings which the defendant presented each psychiatrist. Dr. Reifman testified that the defendant told him that he shot his victims in the hope that they would be taken to the hospital and be cured of their drug habits. On the other hand, he informed Dr. Shlensky that he fired the guns so they would be empty and he would not be hurt, and that he was surprised when his relatives were hit by bullets. Such disparity, when considered with the rationale proffered at trial by the victims concerning the stolen money, could easily have led the jury to conclude that the defendant's statements were self-serving and made in an effort to convince both psychiatrists that he was insane at the time of the shooting. Finally, the respective diagnosis reached by each psychiatrist does not warrant a reversal of the jury's determination. While Dr. Reifman described the defendant as "first, withdrawn and quiet" and indicated the defendant was suffering from "schizophrenia, paranoid type, in partial remission," it has been held that evidence of idiosyncratic behavior or personality disorders alone do not constitute "mental defects" within the meaning of the legislative enactment defining insanity. (*People v. Williams*, 38 Ill.2d 115, 123, 230 N.E.2d 224, 229; *People v. Lono*, 11 Ill.App. 3d 443, 449, 297 N.E.2d 349, 354.) Dr. Shlensky's conclusion does not fare any better since proof of a psychosis also falls short of establishing a "mental disease or defect" within the purview of the applicable section of the Criminal Code. (*People v. Davidson*, 82 Ill.App.2d 245, 248, 225 N.E.2d 727, 728.) Based on such consideration and the reasonable inferences therefrom, as well as the fact that the jury was adequately instructed on this issue and no objections were raised thereto, we sustain the finding by the jury of the defendant's sanity at the time of the occurrence.

■■ The defendant next posits that the giving of Illinois Pattern Jury Instruction—Criminal No. 3.04 was improper and constituted reversible error. This instruction defines motive as "that which prompts a person to act" and indicates that "the State is not required to prove a motive for the commission of the crime charged." (IPI—Criminal No. 3.04 (1968).) While the defendant relies on both the committee note as well as judicial interpretations (*People v. Manzella*, 56 Ill.2d 187, 306 N.E.2d 16; *People v. Jackson*, 22 Ill.App.3d 873, 318 N.E.2d 249) of this instruction in support of his contention, it must be remembered that failure to

408

object to a proposed instruction generally operates as a waiver of any objection on review. (*E.g., People v. Wright,* 32 Ill.App.3d 736, 336 N.E.2d 18, 24; *People v. Robinson,* 21 Ill.App.3d 343, 350, 315 N.E.2d 95, 100.) Since counsel for the defendant expressly indicated at trial that he had no objection to the giving of this instruction, his affirmative conduct precludes such challenge on appeal. Even assuming, arguendo, that an objection was raised at trial, we believe that in light of the overwhelming evidence of the defendant's sanity, the jury was not in any way misled by this instruction so as to prejudice the substantial rights of the defendant.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

DIERINGER and ADESKO, JJ., concur.