THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BERT L. GOODWIN, Defendant-Appellant.

Second District   No. 78-520

Opinion filed April 17, 1980.

Mary Robinson and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE WOODWARD delivered the opinion of the court:

Defendant, Bert Goodwin, was indicted for attempt murder. He was found guilty by a jury and was sentenced to 100 to 200 years' imprisonment. On appeal he contends (1) that the State did not prove beyond a reasonable doubt that he was sane at the time of the offense; (2) that he was prejudiced by the admission of detailed medical testimony and color slides of the victim's wounds; (3) that he was prejudiced by comments in the State's closing argument; and (4) that the sentence is excessive.

Defendant and his wife lived in West Chicago and had experienced marital difficulties prior to the date of the offense. In August of 1977, defendant's wife went to Kentucky to live with some of her family; in September of 1977, defendant convinced her to return with him from Kentucky to the marital home; in the interim, one of defendant's adult children from a previous marriage had moved into the home in West Chicago; defendant and his wife frequently argued about the presence of the son.

Defendant's wife was asleep in bed at 9 o'clock on the morning of September 29, 1977; she was awakened by the sound of a gun going off, realized she had been shot in the vaginal area, and saw her husband holding a shotgun. When she tried to reach the telephone, defendant told her that he "fixed it so it wouldn't work." She crawled to the couch in the living room and defendant sat in a nearby chair holding the gun; he repeatedly cursed her, occasionally told her that he loved her, and then he fell asleep. He woke up when she called for help, and he told her that he was going to watch her die and that then he would kill himself. That afternoon, defendant turned on the stereo at a loud volume, left the house, and returned with a bottle of whiskey which he drank while he sat watching his wife. When some of defendant's children came home, defendant's wife called out that she had been shot and needed help.

Police arrived at the house about 4:30 that afternoon. The living room was in disarray and blood was all over the floor; defendant's wife was lying on the couch bleeding profusely between her thighs; a shotgun was leaning against a wall; the bed was saturated with blood; the wall phone was disconnected; an empty bottle of Scotch whiskey and three empty beer cans were in the living room; an open bottle of Canadian whiskey was in the kitchen with a liquor store receipt on a paper bag; and an expended 12-gauge shotgun shell was in the kitchen trash. After police stated their office to defendant, he stated that he had shot his wife.

Defendant was then advised of the *Miranda* rights, and he made another statement in which he indicated that he shot his wife. Defendant was taken to the police station and advised of the *Miranda* rights again; he stated in part that he shot his wife because she wanted his son to move out of the house.

Defendant contends first, that the State did not rebut his evidence of insanity, that he therefore was not proved sane beyond a reasonable doubt, and that accordingly he could not be found guilty beyond a reasonable doubt. Defendant testified as to several unusual events: his belief that his family was trying to take away his property, that his ex-wife was harassing his family, that his marriage was deteriorating, that he was being poisoned, and that witchcraft was being used against him. Defendant's wife and one daughter both testified, based on some limited mental health training and their experience in working at Manteno State Hospital, that defendant suffered from a mental disease and was paranoid at the time of the offense, the daughter adding that she thought defendant was a paranoid schizophrenic. Dr. Elkun, a psychiatrist who examined defendant for trial and who also interviewed defendant's wife and daughter, testified that defendant suffered from "an acute paranoid disintegrated psychotic state," which is also referred to as "acute paranoid schizophrenia." In answering a hypothetical question, based on the facts of this case and including facts of defendant's background, Dr. Elkun concluded that this mental disease would prevent the person from conforming his conduct to law at the time in question.

The State produced the testimony of a police officer who spoke with defendant briefly on the day of the offense, and who stated that based on his experience as a police officer dealing with people who had mental illnesses, his opinion was that defendant had the capacity to appreciate the criminality of his conduct on the date in question. The State also produced the testimony of Dr. Tuteur, a psychiatrist who examined defendant for trial. Based on a more limited hypothetical question involving only the factors of the incident itself, Dr. Tuteur concluded that defendant was not suffering from a mental disease, could appreciate the criminality of his acts, and did have the ability to conform his conduct to law. On cross-examination, in response to a broader defense hypothetical, including some facts of defendant's background, Dr. Tuteur indicated that he believed the person in the hypothetical should have been "mentally hospitalized."

■■ The question of whether the State has met its burden of showing a defendant to be sane  at the time of the offense is a jury question; a jury determination of this issue will not be disturbed unless it is palpably against the weight of the evidence; the jury may determine the weight and credibility of both expert and lay witnesses; it need not accept the

testimony of expert witnesses; and it must consider the totality of circumstances in determining defendant's sanity at the time of the offense. (*People v. Sims* (1976), 35 Ill. App. 3d 401, 342 N.E.2d 256.) In our opinion, it appears that the jury's determination that defendant was sane is not so palpably against the weight of the evidence as to indicate a basis in passion or prejudice.

■ Defendant next contends that he was prejudiced by the admission of detailed medical testimony as to the victim's wounds and color slides of those wounds. The slides showing the wife's wounds were admittedly gruesome, but as they are probative of defendant's mental state in that the nature of the wounds shows that defendant must have known that his actions created a strong probability of death or great bodily harm, we hold that they were properly admitted. (*People v. Seaberry* (1978), 63 Ill. App. 3d 718, 380 N.E.2d 511.) Further, the slides were of assistance in understanding the medical testimony and the nature of the victim's wound. The slides were therefore relevant to an issue in the case. *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27.

■ ■ Defendant's next contention is that he was prejudiced by two remarks by the State in closing argument. One of the remarks was not objected to and we therefore consider it waived. (*People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.) The other remark was a statement that insanity was the only possible defense and that "there is sort of a general rule that the more heinous the facts, the more likely you are to see insanity." This statement can equally be seen as an assertion that the existence of heinous facts implies insanity; while this is clearly not the law, it is certainly not unfavorable to the defense. After the objection was overruled, the State conceded that, "Maybe there is something wrong with him," although the State also contended that defendant was not "legally, criminally insane." In view of the statement made, if there was any error it must be held as harmless in light of the evidence and the comments favorable to the defense made by the State.

Finally, defendant contends that his sentence of 100 to 200 years is excessive. A sentence will not be altered on review absent an abuse of discretion by the sentencing judge. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) We note also that a proper objective in determining the extent and nature of a criminal penalty is the restoration of the offender to useful citizenship (Ill. Const. 1970, art. I, §11), and that "* * * in determining punishment for the crime, care must be taken to insure that the punishment is appropriate and just. The doing of justice must include a consideration of background and circumstances which affect punishment." *People v. Crews* (1969), 42 Ill. 2d 60, 66, 244 N.E.2d 593, 595.

■ While the sentencing judge obviously gave consideration to the nature and circumstances of the offense, we believe that he did not give

adequate weight to the history and character of the defendant, and defendant's potential for rehabilitation. In our view, defendant's previously unblemished record, the testimony provided by the complaining witness on behalf of the defendant at trial, the letter which she wrote on defendant's behalf for the probation department report, defendant's own letter which was made part of the probation department report, and the testimony of Dr. Tuteur that defendant should have been "mentally hospitalized" are important factors evidencing a potential for rehabilitation on the part of defendant. Although defendant's crime was certainly heinous, we cannot close our eyes to the fact that his wife (the victim) is willing to accept him and that there is the possibility that he might be rehabilitated and returned to a useful role in society, and we accordingly conclude that it was an abuse of discretion for the trial court to impose the sentence that it did. Therefore, under the authority of Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1977, ch. 110A, par. 615(b)(4)), we reduce defendant's sentence to 25 to 50 years' imprisonment.

The judgment and sentence of the trial court is affirmed as modified.

Affirmed as modified.

SEIDENFELD, P. J., and VAN DEUSEN, J., concur.