THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLINTON BURNETT, Defendant-Appellant.

First District (2nd Division) No. 59906

Opinion filed December 31, 1975.

James R. Streicker and Gordon Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and John T. Theis, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Following an indictment charging defendant, Clinton Burnett, with the offense of murder (Ill. Rev. Stat. 1971, ch. 38, par. 9—1(a)(2)), a jury of 11 persons found defendant guilty as charged. Judgment of conviction was entered thereon and a sentence of from 15 to 30 years imprisonment was imposed.

Defendant appeals from this judgment and presents several issues for our consideration: (1) whether defendant knowingly and understandingly waived his statutory right to be tried by a jury of 12 jurors, (2) whether the trial court properly admitted into evidence an exhibit introduced by the State, (3) whether the credibility of certain defense witnesses was improperly impeached, (4) whether it was proper for the trial court, under the circumstances of this case, to instruct the jury that the State did not have to prove motive in order to establish defendant's guilt, (5) whether the prosecution sustained its burden of proving beyond a reasonable doubt that defendant was not acting in self-defense at the time the homicide occurred, and (6) whether the evidence creates a reasonable doubt of defendant's guilt of the charged offense.

## I.

Due to the amount of conflicting testimony adduced at trial and its impact on the issues to be addressed herein, a summation of pertinent portions of the record is necessary. On July 14, 1972, the deceased, Steve Loston, and defendant resided in adjacent apartments, numbers 1508 and 1510 respectively, in a Chicago Housing Authority Project located at 3519 South Federal in Chicago. Loston (hereinafter referred to as "the deceased") died on July 14 after receiving a single laceration under his right arm during a fight that evening with defendant in an area outside of their apartments; a pathologist testified that the cause of death was attributable to the stab wound.

Three corridors form a U-shaped hallway on the floor on which the incident occurred; two side corridors branch off of a main corridor. Outside of each apartment is a small porch area leading to a corridor. A partition or wall extends across approximately one-third of each porch in the passage way between the porch and the corridor. Throughout the trial, this partition was referred to by the witnesses as a "pillar." Two elevators are located in the main corridor. One end of this corridor terminates at defendant's porch. The side corridor which meets the main corridor in front of defendant's porch leads to the deceased's apartment; the porches outside of these two apartments are perpendicularly adjacent to one another.

It is undisputed that defendant was in the deceased's apartment at approximately 6:30 p.m. on July 14. Also present in the apartment at that time were, among others, the deceased and his common-law wife, Elmer "Sue" Loyd; Robert "Foley" Spurlock, a friend of the deceased; and Betty "Rita" Williams, a neighbor who resided in apartment 1512.

Mrs. Williams testified that on July 14 while she was in the deceased's

apartment, she witnessed the following conversation between defendant and the deceased:

> "DEFENDANT: Steve, did you tell me that Rita [Mrs. Williams] told you that I was going with Elmer Loyd?
>
> DECEASED: Man, I didn't tell you no bullshit like that, I don't want to even hear it.
>
> DEFENDANT: You just don't tell me no lie, you just wait until I come back."

She stated that defendant was "shouting" during this conversation. Defendant then left the apartment, and the witness departed shortly thereafter. From her apartment, Mrs. Williams heard defendant say in a "loud" voice from the hallway "You better not come out of there, if you come out of there, I'm going to kill you." About 10-15 minutes later, Elmer Loyd and Robert Spurlock came to her apartment and said "Rita, Clint have cut Steve." Immediately thereafter, the deceased, bleeding and unarmed, "staggered" to her door and collapsed on her porch.

Elmer Loyd testified that defendant was in her apartment on July 14 when the deceased returned home from work. She testified with regard to the argument between defendant and the deceased in a manner similar to Mrs. Williams' version of the conversation. She further testified that defendant left her apartment after the argument, but subsequently returned to the hallway and shouted threatening remarks. A few minutes later, after she and the deceased finished packing for a trip to Detroit, they went out into the hallway to get on the elevator. According to her testimony, the elevator is located 6-8 feet from defendant's apartment. While they were waiting for the elevator, she observed defendant walk out of his apartment and proceed toward the elevator. Defendant had his hand on a brown handled knife which was about 12 inches long. The deceased, who was unarmed, "jumped" behind the pillar in front of defendant's apartment. Defendant "had his hand on the knife and got up to the pillar and looked around like he was going to pull the knife." The deceased "grabbed" defendant and threw him to the floor. After an exchange of punches, defendant "stuck" the deceased under the right arm. Defendant then said to the deceased "I told you I was going to kill you."

On cross-examination, Ms. Loyd stated that the deceased was on top of defendant throughout the fight which lasted for about five minutes. When asked by defense counsel if she heard the deceased say to Robert Spurlock immediately after the stabbing "Man, I told you to reach me my knife," she responded in the negative. Reading from the transcript of the grand jury proceedings, counsel next asked her if she remembered making the following statement before the grand jury: "Oh, and I heard

Steve [the deceased] say one thing. When he walked around he told Foley [Robert Spurlock], 'Man, I told you to reach me my knife.'" She remembered making that statement. However, at a side-bar conference, the prosecution argued that the statement from the transcript had been read out of context. In response, defense counsel agreed to read more of the witness' grand jury testimony in conjunction with his question. When the proceedings resumed, the court struck the last question, whereupon defense counsel asked the witness if she recalled making the following statement before the grand jury:

> "Oh, then I heard Steve say one thing. When he walked around he told Foley, 'Man, I told you to reach me my knife,' and Steve fell. Then he told me to say he didn't say that and I called the Police and I didn't hear any more."

She replied that she did not remember making this statement. Following redirect examination, defense counsel moved that her testimony be stricken on the ground of perjury. In denying this motion, the trial court stated that in matters of impeachment the trier of fact is entitled to determine the credibility to be ascribed to each witness.

Robert Spurlock testified that he did not witness an argument between defendant and the deceased in the deceased's apartment on July 14 because he was asleep at the time it allegedly occurred. He was standing with the deceased waiting for the elevator when defendant came out of his apartment. Defendant "had his hand on a knife, or something." After the deceased jumped behind the pillar, defendant approached and looked around the pillar. The deceased threw defendant down, hit him, and then stood up after he was cut. He did not see the deceased holding a knife until after defendant had left the area.

On cross-examination, he testified that one could only see the hallway, but not the elevators, from defendant's apartment because hallway doors partially obstructed the view. He recalled being asked at the coroner's inquest what type of knife defendant had in his possession on July 14, but he did not remember answering "a white pearl-handled knife." After further examination, he then remembered giving that answer, but maintained that he had been mistaken in this regard in his testimony at the earlier proceeding. He further testified that he did not see the fatal wound inflicted and that he did not hear the deceased say "Man, I told you to reach me my knife."

Albernicia Cox, another resident on the floor where the incident occurred, was called as a defense witness, and she testified that she was standing at the opposite end of the main corridor from defendant's apartment during the fight. From a distance of 20-25 feet, she observed

defendant exit from his apartment, reenter momentarily, and then again walk out onto his porch. As defendant walked into the corridor, the deceased, who had been standing behind the pillar, "tackled" defendant. She could not see the fight because defendant and the deceased fell behind a hallway door and she did not walk to the other end of the corridor. She did not see defendant holding a knife, but she testified that the deceased was holding a knife which was about 8 inches long while he was standing by the pillar. She thought that the deceased tucked the knife into his waistband after defendant reentered his apartment because she did not observe a knife when defendant was tackled.

On cross-examination, Miss Cox stated that she did not discuss the incident with any police officers on July 14 nor did she testify with respect to this case at any proceeding prior to trial. On March 5, 1973, she discussed this case with an investigator from the Sheriff's department. She recalled telling the investigator that she saw the deceased holding a knife immediately prior to the fight.

Joan Walker, Albernicia Cox' mother, also testified as a defense witness. At about 5 p.m. on July 14, she was standing with her daughter on the porch of her apartment and observed defendant standing in the hallway at the opposite end of the main corridor telling the deceased to come out of his apartment. After 10-15 minutes, defendant went into his apartment. About 10-15 minutes later, the deceased was standing with a group of people by the elevator. The deceased, holding a knife 6-7 inches long, walked over to the pillar as defendant walked out onto his porch. Defendant walked back to his apartment door, and at that time the deceased placed the knife in his waistband. When defendant walked past the pillar, the deceased "tackled" him. Although her view of the altercation was momentarily blocked by the hallway door, she walked over to where they were fighting. She observed the deceased on top of defendant and "beating" defendant in the face. The deceased then "turned around and asked the children to find his so and so knife so he can kill this so and so." Shortly thereafter, the deceased stood up, grabbed under his right arm, and fainted. She next saw defendant when he came back to the scene of the occurrence accompanied by two police officers. She further testified that "there was already some up there" and that she later "was standing there talking to the polices."

On cross-examination, Mrs. Walker stated that she did not see the deceased get stabbed. She testified that two sets of uniformed police officers arrived at the scene. The first group containing three or four officers arrived 30-40 minutes after the fight. The second group consisted of two officers and defendant. After the victim's body was removed,

she talked to one of the officers who had arrived with the first group, but she did not recall his name. She told the officer her name and stated that she had seen the deceased holding a knife. She did not testify at any other proceeding prior to trial.

## II.

We first consider defendant's argument that he did not knowingly or understandingly waive his statutory right to a trial by 12 jurors. (Ill. Rev. Stat. 1971, ch. 38, pars. 103—6, 115—4(b).) Immediately after 12 jurors were sworn, but outside the presence of the jury, defense counsel and one of the prosecutors stipulated that in the event "one or more" members of the jury became unable to carry out the responsibilities of a juror, they would accept and abide by a verdict rendered by the remaining jurors. This stipulation was later modified to provide that at least 10 jurors must hear the cause. The record is silent as to defendant's presence at the time the stipulation was made of record. During the cross-examination of the first defense witness, one juror was absent for medical reasons. Defense counsel was notified of this fact, but stated that he had no questions with regard to proceeding with only 11 jurors. This juror was absent for the remainder of the trial and did not participate in the rendition of the verdict. Prior to the imposition of sentence, defendant made the following statement to the trial court:

> "I asked to be tried by a jury of twelve jurors. I did not agree in any way to be tried by a jury of less then twelve jurors, and this has been my complaint during the time that the court stated that the absent juror had taken sick—and this hasn't come out before the court. I did not agree."

In his corrected reply brief, defendant concedes that *People v. Murrell,* 60 Ill.2d 287, 326 N.E.2d 762, cited in the State's brief, "stands on its head" the position advanced by defendant that he had not knowingly and understandingly waived his right to be tried by 12 jurors. Notwithstanding this admission, defendant requests that the cause be remanded for a determination of whether defendant disagreed with his trial counsel with regard to the stipulation and whether this fact was suppressed during trial. We will not grant defendant's request.

■■ Defendant's assessment of the applicability of *Murrell* to the instant case is correct. Although *Murrell* pertained to whether a waiver of trial by jury was knowingly and understandingly entered, rather than whether defendant voluntarily agreed to be tried by less than 12 jurors, the rationale set forth therein applies a fortiori to the facts presented in the instant case. Nothing contained in the record suggests that defendant

was absent from the proceedings when the stipulation was made or from the courtroom throughout the trial, nor does defendant now contend that he was not present. Consequently, we assume that defendant was present during this portion of the proceedings. Furthermore, it was not until a verdict of guilty was returned and judgment entered thereon that defendant manifested an objection to the size of the jury that heard the case. In light of these circumstances, we will not presume from a silent record that defendant was absent when the stipulation was made or that the waiver was not knowingly and understandingly made. Hence, defendant is deemed to have acquiesced in, and is bound by, his attorney's action. See *People v. Murrell,* 60 Ill.2d 287, 290, 326 N.E.2d 762, 764.

Defendant's second contention is that reversible error was committed by the trial court when it admitted into evidence, over defense counsel's objection, a certain photograph offered by the State. This exhibit depicted the side corridor which leads to the deceased's apartment. The investigator whose testimony laid the foundation for the introduction of this exhibit accurately described what was depicted by the photograph. Since neither defendant's apartment nor the elevators were visible in the photograph, this witness, upon the State's request, drew two arrows on the photograph to indicate the direction to each of these areas; one of the arrows was labeled "elevator" and the other labeled "1510." In addition, this witness stated on direct examination and reiterated on cross-examination that a person standing in the main corridor by the elevators could see "directly to the door" of defendant's apartment. During closing argument, the assistant State's Attorney referred to this testimony and this exhibit when stating to the jury that defendant, when leaving his apartment, had a clear view of the hallway and the people standing near the elevator, and therefore, defendant would not have proceeded into the corridor if it had been the deceased who was holding a knife.

■■ We find no error in the admission into evidence of this photograph, and we consider the prosecutor's comments in this regard during closing argument to be reasonable inferences deductible from the evidence adduced at trial. (*People v. Gleitsmann,* 384 Ill. 303, 51 N.E.2d 261.) Defendant argues that the arrows and labels added to the photograph by the investigator distorted the photograph, confused the jury, had the effect of improperly discrediting the defense witnesses, and thus, deprived him of a fair trial. We note, however, that not one question was asked of this witness on cross-examination directly pertaining to this exhibit in order to either discredit or clarify the testimony elicited from this witness on direct examination. Furthermore, other witnesses

testified that they could see defendant's apartment while standing in the main corridor. Our examination of a certified floor plan of the floor on which the incident occurred reveals that due to the location of various doors and the "pillar," whether one could see defendant's apartment while standing in the main corridor depends entirely upon where one is standing. And although the testimony elicited on this point was both conflicting and confusing, the testimony of each witness, with the possible exception of the investigator's statement that no wall is located in front of defendant's apartment which could obstruct one's view, was probably quite accurate when their respective vantage points are considered. Moreover, a defense exhibit was admitted which clearly depicts the main corridor and the pillar outside of defendant's apartment. Referring to this exhibit in his closing argument, defense counsel lucidly explained his theory of the case. As a result, a question of fact of who was the aggressor was presented for the jury's resolution. Hence, we hold that the admission of this particular exhibit did not result in prejudice to defendant so as to deprive him of a fair trial.

■■ Defendant cites three instances which he believes not only illustrate improper conduct on behalf of the prosecutors, but which also had the effect of depriving him of a fair trial. First, defendant quotes two remarks allegedly made by one of the prosecutors from the prosecution table during the testimony of Albernicia Cox. Defendant's counsel submitted an affidavit in which he stated that he heard one of the assistant State's Attorneys say "She said that, she said that" and "She is well coached" on two occasions during her testimony. Defendant argues that by these statements, the prosecutor's attempt to discredit Miss Cox' testimony was highly improper and prejudicial. When defense counsel informed the trial court of this matter at a side-bar conference, the judge commented that he had not heard the remarks, and therefore, he was unable to determine if the jury was influenced by them. The judge further noted that he did not believe that the entire jury could have heard the statements, but that he would handle the situation in an appropriate manner if he perceived that improper statements were being made. We believe that the trial court's disposition of this matter was proper and that no prejudice accrued to defendant.

Defendant next points to the rebuttal testimony of the deceased's brother as another instance in which the prosecution attempted to discredit the testimony of certain defense witnesses in an improper and prejudicial manner. Over defense counsel's objection, the trial court allowed this witness to testify in rebuttal to contradict Mrs. Walker's testimony that she had seen the deceased in the apartment building

around 5 p.m. on July 14. However, once on the stand, this witness testified not only that he had seen the deceased downtown on July 14 at approximately 5:45 p.m., but also that the deceased at that time had two tickets to the cleaners, and that he did not observe the alleged murder weapon in the deceased's possession. During closing argument, the State both commented upon and misrepresented this rebuttal testimony. No objection was made to this portion of the State's argument.

■■ Rebuttal witnesses may properly be called by the State to contradict testimony elicited by the defense, but only with respect to material issues in the case. (*People v. McGhee*, 20 Ill.App.3d 915, 314 N.E.2d 313.) Collateral matters which are not the proper subject for comment by rebuttal witnesses are generally considered to include facts which are irrelevant to the substantive issues in the case and facts which are not independently provable by extrinsic evidence, apart from impeachment purposes. *People v. McGhee.*

■■ Here, it is arguable whether the impeachment of Mrs. Walker's statement was a proper subject for rebuttal, thus we cannot say that the trial court abused its discretion in allowing this witness to testify for this limited purpose. In our judgment, however, other testimony elicited from this witness constituted improper impeachment, and the trial court erred in admitting it. Nonetheless, this testimony pertained to matters which were remote to the substantive issues presented in this case, and hence, we do not believe that the introduction of this testimony was sufficiently prejudicial to defendant to warrant a reversal of his conviction. (Compare *People v. Dennis*, 47 Ill.2d 120, 265 N.E.2d 385, with *People v. McGhee*.) Defendant maintains that this error was amplified during the State's argument to the jury, but we find no compelling reason why the general rule which provides that failure to object to closing arguments bars their review should not apply. *People v. Morgan*, 28 Ill.2d 55, 190 N.E.2d 755; *People v. Winstead*, 90 Ill.App.2d 167, 234 N.E.2d 175.

■■ The third allegation made by defendant of improper conduct by the prosecution is that the prosecutor's closing argument invaded the province of the trial court by attempting to instruct the jury. Although the statements referred to exceeded the bounds of legitimate argument, their effect on the trial could not constitute reversible error. In reaching this determination, we note that the remarks were met by timely objections by defense counsel which were sustained by the court, the court interjected curative remarks, and the jury was subsequently instructed by the court as to the applicable law. Moreover, the gravity of these remarks was not such as to require reversal, notwithstanding the manner

in which they were treated. Compare *People v. Hall,* 1 Ill.App.3d 949, 275 N.E.2d 196, with *People v. Weinstein,* 35 Ill.2d 467, 220 N.E.2d 432, and *People v. Wright,* 80 Ill.App.2d 300, 225 N.E.2d 460.

The fourth issue raised by defendant is whether reversible error resulted when the jury was given Illinois Pattern Jury Instruction—Criminal No. 3.04 (1968). This instruction defines "motive" and provides that the State is not required to prove a motion for the commission of the charged offense in order to establish defendant's guilt. However, the IPI Committee Note which follows this instruction provides that this instruction should not be given if the prosecution elicits testimony which tends to establish a motive and then argues the circumstances of that motive to the jury.

Defendant contends that evidence was adduced at trial pertaining to an argument between defendant and the deceased prior to their fight in the hallway, and that the State argued to the jury that this dispute prompted defendant to fatally stab the deceased. Defendant concludes that in light of this evidence, it was highly prejudicial for the jury to receive this instruction.

■■ The giving of this instruction has been held to constitute error when motive evidence is adduced and commented upon in an attempt to establish the identity of the wrongdoer (*People v. Manzella,* 56 Ill.2d 187, 306 N.E.2d 16) or to discredit a self-defense claim. (*People v. Jackson,* 22 Ill.App.3d 873, 318 N.E.2d 249.) Similarly, we hold that the giving of IPI No. 3.04 under the circumstances present in the instant case constituted error. However, the giving of this instruction did not constitute reversible error. Sufficient evidence was adduced at trial, independent of the motive evidence, upon which the judgment of conviction can rest; the testimony of Elmer Loyd and Robert Spurlock support the conclusion that defendant was the aggressor at the time of the incident. *People v. Jackson, supra; see People v. Manzella, supra.*

■■ Before addressing the final issues raised by defendant, we feel compelled to mention that one instruction given to the jury is labeled in the record as "COURT'S INSTRUCTION NO. 1." All other instructions given were IPI instructions. This particular instruction is identical to IPI No. 25.05, "Issues in Defense of Justifiable Use of Force," with the exception that it added one additional element to the State's burden. The instruction given by the court provided in pertinent part as follows:

> To sustain the charge of murder, the State must prove the following propositions:
>
>        *   *   *   *
>
> *Third:* The defendant was not justified in using the force which he used; and

*Fourth:* That the defendant did not reasonably believe that circumstances existed which justified the use of force which he used.

The fourth proposition in this instruction is not included in IPI No. 25.05. We consider the instruction given by the trial court to be misleading and that IPI No. 25.05 is preferable. However, since this instruction could only have had the effect of increasing the State's burden of proof in this case, no prejudice to defendant could have resulted from the giving of this instruction.

Having found that defendant was not deprived of a fair trial, we will consider defendant's final argument that the evidence adduced at trial was insufficient to establish beyond a reasonable doubt his guilt of murder. Defendant maintains that he was justified in using deadly force in defense of his person (Ill. Rev. Stat. 1971, ch. 38, par. 7—1), and that in response to this affirmative defense, the State failed to sustain its burden of proving beyond a reasonable doubt that defendant did not act in self-defense. (Ill. Rev. Stat. 1971, ch. 38, pars. 7—14, 3—2.) In the alternative, defendant urges that the record would at most sustain a conviction for voluntary manslaughter. Ill. Rev. Stat. 1971, ch. 38, par. 9—2(a).

With respect to his self-defense claim, defendant points to the testimony of Miss Cox and her mother who stated that they saw the deceased holding a knife immediately prior to the time when the deceased "tackled" defendant. Defendant also contends that the evidence, particularly Mrs. Walker's testimony that she heard the deceased ask children to find his knife so that he could kill defendant, establishes that his life was threatened by the deceased. Thus, defendant concludes that since it is uncontroverted that he was beneath the deceased throughout the fight, and further, since the deceased was armed and threatened to kill defendant, he was justified in using deadly force.

This evidence clearly raises the issue of self-defense (Ill. Rev. Stat. 1971, ch. 38, par. 3—2(a)), but defendant ignores other evidence which was properly presented for the jury's consideration. The testimony of two occurrence witnesses supports the theory that it was defendant and not the deceased who was armed, and that defendant was thrown to the floor by the deceased out of necessity when defendant looked around the pillar.

■■ If the issue of self-defense is properly before the trier of fact in a criminal proceeding, the prosecution must prove beyond a reasonable doubt not only that defendant committed each element of the charged offense, but also that defendant was not acting in self-defense. (*People v. Johnson*, 108 Ill.App.2d 150, 247 N.E.2d 10.) When this issue is raised

to justify the use of force which is intended or likely to cause death or great bodily harm, the test which should be applied by the trier of fact is did this particular defendant reasonably believe that the circumstances to which he was confronted necessitate the use of such force. (*People v. Johnson*, 2 Ill.2d 165, 117 N.E.2d 91.) If conflicting evidence is presented on this issue, it is the function of the trier of fact to assess the credibility of the witnesses and to reach a determination accordingly. (*People v. McClain*, 410 Ill. 280, 102 N.E.2d 134.) After this determination is made and a verdict reached, a court of review should not substitute its judgment for the jury's finding unless the evidence is palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory so as to create a reasonable doubt of defendant's guilt. *People v. Johnson*, 2 Ill.2d 165, 117 N.E.2d 91; *People v. Johnson*, 108 Ill.App.2d 150, 247 N.E.2d 10.

■■ Our review of the record reveals sufficient evidence to sustain the jury's finding, implicit in the verdict, that the prosecution sustained its burden of proving beyond a reasonable doubt that defendant did not act in self-defense. But defendant argues further that a reasonable doubt of his guilt of murder remains, notwithstanding the fact that the evidence is conflicting on this issue, because the testimony of the two occurrence witnesses called by the State is contradictory and inconsistent, whereas the testimony elicited from two defense witnesses is consistent and remained undisturbed under cross-examination. Defendant asserts, moreover, that Elmer Loyd's grand jury testimony supports his contention that the deceased was armed and intended to kill him.[1] Defendant further maintains that when the trial testimony of Robert Spurlock is compared with the statements he made at the coroner's inquest, his credibility is left in doubt.

■■ This position advanced by defendant both understates the record and misinterprets the law. First, mere conflicts in the testimony of a witness with his prior statements or with other evidence adduced at trial does not ipso facto establish that the witness has committed perjury. (*People v. Lagios*, 39 Ill.2d 298, 235 N.E.2d 587.) Defendant attempted to impeach the credibility of both Elmer Loyd and Robert Spurlock by confronting them with statements they had previously made which were inconsistent with their testimony at trial. In fact, defendant buttressed his attack against Ms. Loyd's veracity by calling as a witness the court

---

[1] Defendant cites another instance of inconsistency between Elmer Loyd's testimony at trial and her testimony before the grand jury pertaining to the argument in the deceased's apartment. However, since this matter was not brought out at trial for the jury's consideration, we will not consider it further.

reporter who had transcribed the grand jury proceedings. By this procedure, defendant employed the most effective means of attack upon the credibility of these two witnesses (see McCormick on Evidence § 33 (2d ed. 1972)), but the verdict speaks for itself, and we find adequate evidence contained in the record to sustain the judgment of conviction.

Second, the prosecution presented rebuttal evidence which, if believed by the jury, tended to contradict the testimony of the two key defense witnesses. Mrs. Walker testified that after the stabbing, she related what she had seen to an officer who had arrived at the scene. In rebuttal, the prosecution called two Chicago police officers and an investigator. Each testified that they did not have a conversation with either Mrs. Walker or Miss Cox on the evening of July 14. The investigator further testified that he had obtained all police reports which had been prepared in conjunction with this incident and the names of these two defense witnesses did not appear therein. During closing argument, the presecutor stated that the evidence shows that Mrs. Walker did not talk to any of the seven officers present at the scene. Defendant argues that after careful examination of the record, and in particular the testimony of one police officer who stated that "Chicago Housing Authority Police" were present at the scene when he arrived, it is "clear that it was one of these CHA officers that Mrs. Walker talked to." However, not only did defendant fail to object to this portion of the prosecution's closing argument, thus waiving any error which may have occurred (*People v. Skorusa*, 55 Ill.2d 577, 304 N.E.2d 630), but also we consider that the prosecutor's remarks in this regard were reasonable inferences which could be deduced from the evidence presented at trial, and as such, represented a legitimate subject for comment by the State. *People v. Gleitsmann*. See also *People v. King*, 10 Ill.App.3d 652, 295 N.E.2d 258; III Wigmore, Evidence § 1042 (3d ed. 1940).

The prosecution also called as a rebuttal witness a member of the Sheriff's department who testified that he interviewed Miss Cox on March 5, 1973, and, contrary to her testimony, she stated to him that she did not see the deceased with a weapon in his possession on July 14. Since the testimony of several witnesses was contradicted, the issue of their credibility became, as always, a question of fact for the tried to resolve. (*People v. Sudduth*, 14 Ill.2d 605, 153 N.E.2d 557.) The jury apparently found the State's rebuttal evidence convincing.

■■ And third, defendant's attempted use of Ms. Loyd's and Mr. Spurlock's prior inconsistent statements as substantive evidence in support of his theory of the case is unsupported by case authority in Illinois. In *People v. Coleman*, 17 Ill.App.3d 421, 308 N.E.2d 364, we stated that

only testimony given by a witness while under oath and subject to cross-examination may properly be considered by factfinder as substantive evidence. Although prior inconsistent statements attributable to a witness may be admitted for the limited purpose of impeachment, any other attempted use of such statements is necessarily incompetent on hearsay grounds. *People v. Coleman*; see *California v. Green*, 399 U.S. 149, 26 L.Ed.2d 489, 90 S.Ct. 1930.

■■ Defendant contends in the alternative that the evidence would at most sustain a conviction for voluntary manslaughter. In this regard, defendant strongly relies upon *People v. Johnson*, 4 Ill.App.3d 249, 280 N.E.2d 764. However, in *Johnson*, and two cases cited therein (*People v. Hough*, 102 Ill.App.2d 287, 243 N.E.2d 520; *People v. Stepheny*, 76 Ill.App.2d 131, 221 N.E.2d 798), there was insufficient evidence to show a cooling-off period following provocation by the victim, and therefore, the requisite mental state for the offense of murder was not present. In his brief, defendant admits that "A sufficient period of time had elapsed to permit the parties to cool off" after the argument in the deceased's apartment. Perhaps the jury reached the same conclusion, a result which is warranted by this record.

As could be expected in a case of this nature, the record is not free from error. However, our function as a court of review in a criminal case is not to determine if the record is perfect, but rather to determine if defendant received a fair trial under the law and whether his conviction is based upon evidence establishing his guilt beyond a reasonable doubt. (*People v. Kirkwood*, 17 Ill.2d 23, 160 N.E.2d 766.) For the reasons set forth above, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

DOWNING, P. J., and LEIGHTON, J., concur.