THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT C. DAILY, Defendant-Appellant.

First District (1st Division)   No. 78-1421

Opinion filed December 17, 1979.

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Mark X. VanCura, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Robert C. Daily, was found guilty by a jury of attempt murder, aggravated battery and unlawful use of weapons. The trial court merged the aggravated battery conviction into the attempt murder conviction and imposed concurrent sentences of from 20 to 35 years for attempt murder and from 3 to 9 years for unlawful use of weapons. Defendant appeals.

Police Officer Lloyd Taylor, the complaining witness, testified that on September 27, 1976, at approximately 6:55 p.m., he and his partner, Officer Ocie High, were instructed by radio to go to an apartment building located at 3334 West Maypole, Chicago, where a man reportedly was carrying a shotgun. Officer Taylor stated that he and Officer High were working in plain clothes at this time. When they arrived, they went inside to an apartment on the second floor and spoke there with an individual who told them there was a man with a shotgun in apartment 303. At this time, Officer Taylor testified, they were joined by Investigators Steve Steele and John Schaefer, who also were working in plain clothes; they told Steele and Schaefer about the man with the shotgun.

Officer High corroborated Taylor's testimony and further stated that the person they talked with at the second floor apartment told them the man with the shotgun had caused a disturbance the day before and had tried to rape a woman.

After Investigators Steele and Schaefer had joined them, Officer Taylor testified, he began to walk up the stairs from the second floor to the third floor. He was holding his gun in his hand, with the barrel pointing up, not pointing at anyone. As he approached the landing midway between the second and third floors, he noticed a man, whom he identified as defendant, standing on the third floor landing, pointing a shotgun at him. He immediately backed down the stairs to the second floor, informed the other officers that he had seen a man with a shotgun and told Steele and Schaefer to go around and cover the back of the building.

Officer High and Investigators Steele and Schaefer testified that they were following behind Taylor as he was climbing the stairs and

corroborated the fact that Taylor told them he had seen a man with a shotgun.

Officer Taylor further testified that after telling Steele and Schaefer to cover the back of the apartment building, he yelled "police" up to the third floor. Officer High and Investigator Schaefer corroborated Taylor's testimony that he shouted "police" at this time. Taylor stated that he next looked up the stairs, was unable to see defendant, and then, with gun in hand, climbed the stairs to the landing between the second and third floors. At the landing, he still was unable to see defendant and he continued climbing the stairs to the third floor. The stairwell from the second to the third floor and the third floor landing, Officer Taylor testified, were well lighted. Officer High and Investigator Steele corroborated Taylor's testimony that the stairs were well lighted.

When he reached the top of the stairs and was crossing the threshold from the third floor landing into the hallway, Officer Taylor testified, he turned his head to the left and saw defendant standing about two feet away, aiming the shotgun at him. Defendant then fired the shotgun at Taylor and the blast hit him on the neck and shoulder and the left side of his face and lifted him up and pushed him against the wall. Up until then, Officer Taylor stated, he had not fired his gun, but at this time he fired two shots towards the ceiling to let Officer High know he was alive, and then he crawled back to the second floor landing. Officer High testified that he saw Taylor go up to the third floor, heard a shotgun blast, after which Taylor fell and fired two shots into the ceiling.

Officer Taylor also testified that he had seen defendant several times before the day defendant shot him. On June 12, 1975, he had had a conversation with defendant for three to five minutes. He had not informed defendant during this conversation that he was a police officer. He had had another conversation with defendant on June 14, 1975, for two or three hours, during which he had informed defendant he was a policeman. He also had talked with defendant for one and a half hours on July 14, 1975, and for 15 to 20 minutes on July 21, 1975.

Officer Patrick Darcy, who arrested defendant, testified that when he arrived at the apartment building he heard two or three shots and was told that an officer had been wounded. He then went to cover the back of the building, where he saw defendant jump over a fence and run across the yard next door. Officer Darcy testified that subsequently he searched the porch of the building next door, found defendant there and took him into custody.

Officer Michael McGuire testified that on the evening of the shooting he went to apartment 303, looked in the refrigerator and there found the shotgun, which he identified as an exhibit.

Annie White, a tenant in the apartment building, testified that at

approximately 5:45 p.m. on September 27, 1976, she saw defendant on the second floor carrying a sawed-off shotgun, which she identified as an exhibit. She further stated that defendant on this occasion pointed the shotgun in her face. Annie White also admitted she was a friend of Milton Givan.

Clarence Thomas, who lived with Annie White, testified that he spoke with her at about 6 p.m. on September 27, 1976, and then called the police. When the police arrived, he told them there was a man with a shotgun on the third floor and that they should be careful. Soon afterwards, Thomas testified, he heard a shotgun blast and then two shots from a pistol. He next saw Officer Taylor falling down the stairs.

Corinne Barr, another tenant in the apartment building, testified that on September 26, 1976, Milton Givan, who lived on the second floor, had accused defendant of raping a friend of Givan. On September 27, Ms. Barr testified, she and the defendant's sister, Linda Daily, went to talk to Givan. Givan told them he did not want to meet with defendant. She and Linda then returned to defendant's apartment and told defendant that Givan refused to come up to talk with him about settling their differences. Subsequently, Ms. Barr testified, she heard people coming up the stairs and saw defendant leave the apartment carrying a sawed-off shotgun. She did not hear anyone yell out "police." Shortly afterwards, she heard a shotgun blast, followed by two other shots. Defendant then came back into the apartment and said that it was not Milton, but a policeman.

Defendant testified that he and Milton Givan were coworkers and that he had known Givan for about a year. On September 27, 1976, he learned that Givan and some of Givan's friends had come to the place where he was employed and had accused defendant of raping Givan's girlfriend. Later, at about two o'clock that afternoon, he spoke to Givan on the telephone. Defendant testified that Givan told him he better try to get Givan first, because if Givan saw defendant he was going to kill him.

At about five o'clock that afternoon, defendant purchased a shotgun from a man at a playground. Defendant then returned to his apartment and began packing clothes for himself and his girlfriend. Soon, his sister arrived at his apartment, followed by his girlfriend, Patricia Rhodes, and John Rhodes and Corinne Barr. Defendant told Corinne Barr about Givan's threats, and she and defendant's sister then went downstairs with the shotgun to try to get Givan to talk with defendant about their differences. Ms. Barr and his sister returned a few minutes later and told him Givan did not want to talk.

Shortly after this, defendant stated, he was sitting on the bed, holding his gun, when he thought he heard several people coming up the stairs. Defendant testified that he felt scared when he heard this, because he feared that Givan and his friends were going to kill him. He opened his

apartment door and looked out, saw nothing and stood there for a few minutes. Defendant testified he then walked a few steps toward the stairwell and saw the top of a man's head and a gun apparently coming at him around the corner. He fired the shotgun and heard two more shots as he ran back into the apartment. Someone there asked him if it was Givan and he said he did not know. He then put the shotgun down and jumped out the window. After he landed, he climbed a fence and went up on a neighbor's back porch, where he was soon arrested.

Defendant further testified that before he fired the shotgun, he did not hear anyone shout "police." Defendant also stated he did not recognize Officer Taylor's face before he fired the shotgun and that he did not get a good look at the face of the man he shot, because he was focusing his attention on the man's gun, which he testified was pointed directly at him. In addition, defendant stated that when he fired the shotgun he feared for his life and did not intend to do any bodily harm to Officer Taylor. Defendant also denied ever standing on the third floor landing and pointing the shotgun downward.

Linda Daily, defendant's sister, testified as a defense witness. She stated that she saw defendant in his apartment at about one or two o'clock on the afternoon of September 27, 1976. At about three or four o'clock that afternoon, she saw Milton Givan in front of Givan's apartment with three or four men, one of whom had a gun. Later that day, she and Corinne Barr left defendant's apartment, carrying a shotgun, and went downstairs to tell Milton Givan that defendant wished to talk to him so that nobody would be hurt. At Givan's apartment she saw the man she earlier had seen with a gun, but at this time she did not see a gun in his, Givan's or anyone else's hand. Milton Givan told her and Corinne that he did not want to talk, and they returned to defendant's apartment and informed defendant of this.

At this moment, Ms. Daily testified, she told defendant she thought she heard someone at the door. When defendant opened the door she heard someone call out defendant's name and also heard someone coming up the stairs. Defendant at this time was in the doorway, holding the shotgun. She next heard a shotgun blast, followed by two other shots, and saw defendant jump back inside the door. Defendant put the gun down, said he did not know if he had shot anyone, and jumped out the window.

Defendant first contends that, under the holding in *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28, it was error for the trial court to give IPI Criminal No. 7.01 (Illinois Pattern Jury Instructions, Criminal, No. 7.01 (2d ed. 1968)), which instructed the jury that they could find defendant guilty of attempt murder if he had acted with an intent to kill or "do great bodily harm." Defendant argues that he had to have acted with the specific intent to kill to be guilty of attempt murder and,

therefore, the jury should not have been instructed that he could be convicted merely if he had intended to do great bodily harm.

The State concedes that under *Harris* instructions should make it clear that to convict a defendant of attempt murder "nothing less than a criminal intent to kill must be shown." (*Harris*, at 27.) The State argues, however, that defendant waived this particular issue because he failed at trial to specifically object to the fact that the instruction stated he could be convicted for intending to do great bodily harm. We agree.

■■ Grounds for objection are to be "particularly specified." (Supreme Court Rule 451(b), Ill. Rev. Stat. 1977, ch. 110A, par. 451(b).) Defendant, because he failed to specifically raise at trial the objection he now asserts on review, has waived consideration of this issue. (*People v. Humes* (1979), 78 Ill. App. 3d 255, 397 N.E.2d 130.) The fact that a timely specific objection is necessary to avoid waiver of an alleged error in an instruction allows the trial court to correct any defects before the instruction is given, and precludes a party from benefiting from the error on appeal through his failure to object.

Defendant maintains, however, that defense counsel's failure to object was the result of incompetence. Defendant argues that the decision in *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888, decided on October 5, 1977, should have made defense counsel aware by the time the jury was instructed on March 29, 1978, that it was improper to allow the jury to convict defendant of attempt murder if they only found he had intended to do great bodily harm. Defendant urges, therefore, that because defense counsel's failure to make a specific objection was due to incompetence, and was not a tactical decision, we should view as plain error the fact that the instruction allowed the jury to convict defendant merely for intending to do great bodily harm.

■■ ■ We disagree that defense counsel's failure to make a specific objection amounted to incompetence. In *Trinkle*, the supreme court only held that it was error to instruct a jury they could convict a defendant of attempting to murder an individual if the defendant acted " 'knowing such act created a strong probability of death or great bodily harm to [the individual].' " (*Trinkle*, at 201.) It was not until the decision in *Harris*, decided on May 26, 1978, that the supreme court specifically held that instructions must make it clear that to convict for attempt murder nothing less than a criminal intent to kill must be shown, and that it was error to instruct a jury that a defendant was guilty of attempt murder if he acted with an "intent to kill or do great bodily harm." Thus, defendant's argument that defense counsel was incompetent in failing to object to this instruction on the basis of the holding in *Trinkle* is unpersuasive. Furthermore, a defendant generally may not complain that his counsel did not provide him adequate representation unless the representation

amounted to virtually no representation or reduced the trial to a farce or sham. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) The record shows that defendant was afforded adequate representation, as defense counsel not only thoroughly cross-examined the State's witnesses and made a strong closing argument for defendant, but also filed a detailed motion for a new trial and arrest of judgment.

We conclude that instructing the jury in this case that defendant could be convicted of attempt murder if he acted with an intent to kill or do great bodily harm was not plain error and that defendant waived this issue by his failure to make a specific objection.

■ Even if we were to assume, however, that giving this instruction was plain error, we would nevertheless consider it harmless beyond a reasonable doubt. A shotgun is *per se* a deadly weapon (*Ewurs v. Pakenham* (1972), 8 Ill. App. 3d 733, 290 N.E.2d 319), and "it is well settled that the intent to take human life may be inferred from the character of the assault * * * and that such an inference is strengthened by the use of a deadly weapon or other circumstances." *People v. Muldrow* (1975), 30 Ill. App. 3d 209, 217, 332 N.E.2d 664.

■ Officers Taylor and High and Investigator Steele all testified that the stairwell from the second to the third floor was well lighted. Also, Taylor testified that defendant aimed the shotgun at him from about two feet away and fired a blast that hit him in the left side of his face, neck and shoulder. Based on this evidence, the inference that defendant acted with the specific intent to kill Taylor was overwhelming, regardless of defendant's motive for shooting Taylor. It is clear the jury would have found defendant guilty of attempt murder even if they had only been instructed that defendant must have acted with the specific intent to kill. See *People v. Lindsay* (1978), 67 Ill. App. 3d 638, 384 N.E.2d 793.

Defendant also contends that the State did not prove beyond a reasonable doubt that he was not acting in self-defense when he shot Taylor. The State admits it had to prove beyond a reasonable doubt that defendant was not acting in self-defense, but argues that the evidence was sufficient to meet this burden of proof. We agree.

A shotgun, as stated, is *per se* a deadly weapon and the use of it amounts to deadly force for the purpose of determining the amount of force which may permissibly be used in self-defense. (*Ewurs v. Pakenham* (1972), 8 Ill. App. 3d 733, 290 N.E.2d 319.) The issue in determining a defendant's right to use deadly force in self-defense is whether the defendant, when he used such deadly force, actually and reasonably believed he was threatened with unlawful force that could have imminently caused him death or great bodily harm. Ill. Rev. Stat. 1977, ch. 38, par. 7—1; *People v. Burnett* (1975), 35 Ill. App. 3d 109, 341 N.E.2d 86.

■■ Defendant's argument that he acted in self-defense is based on the theory that when he shot Taylor defendant actually and reasonably believed he was threatened with death by Milton Givan and Givan's associates. However, Officers Taylor and High and Investigator Schaefer all testified that Taylor shouted "police" up to the third floor before he went up there the second time. In addition, Taylor, High and Steele testified that the stairway from the second to the third floor was well lighted and Taylor testified that he saw defendant pointing the shotgun at him the first time he had begun climbing the stairs to the third floor and that he and defendant had previously met on several occasions, during which he had told defendant he was a policeman. Also, Corinne Barr testified that when defendant returned to his third floor bedroom immediately after shooting Taylor, defendant said it was not Milton Givan he had shot, but a policeman. This evidence, taken together, strongly supports the view that when defendant shot Taylor defendant knew he was shooting a policeman who was performing his law-enforcement duties.

A reviewing court will not disturb a jury's verdict merely because there is conflicting testimony "unless the evidence is palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory so as to create a reasonable doubt of defendant's guilt." (*People v. Burnett* (1975), 35 Ill. App. 3d 109, 122, 341 N.E.2d 86.) The evidence here was more than sufficient to prove beyond a reasonable doubt that when defendant shot Taylor defendant knew he was not threatened with unlawful force that could have imminently caused him death or great bodily harm.

Defendant maintains that the trial court erred in not giving IPI Criminal No. 25.05 (Illinois Pattern Jury Instructions, Criminal, No. 25.05 (1968), which instructs the jury that the State has to prove beyond a reasonable doubt that a defendant's use of force was not justified as self-defense. The State urges that several instructions were given which, taken as a whole, were sufficient to instruct the jury concerning the State's burden of proof with respect to self-defense. These instructions included IPI Criminal No. 7.01, defining murder; IPI Criminal No. 6.07, defining attempt; IPI Criminal No. 24.06, defining when the use of force is justified as self-defense; and IPI Criminal No. 2.03, stating that a defendant is presumed innocent and that the State has the burden of proving the defendant guilty beyond a reasonable doubt. (Illinois Pattern Jury Instructions, Criminal, Nos. 7.01, 6.07, 24.06 and 2.03 (1968).) The State further urges that defendant never tendered IPI Criminal No. 25.05 and, therefore, waived the right to argue on appeal that failure to give this instruction was reversible error.

Defendant argues that the instructions relied on by the State were not sufficient as a whole to inform the jury of the State's burden of proof with

respect to self-defense and that the waiver rule is inapplicable because failure to give IPI Criminal No. 25.05 was plain error. Defendant cites *People v. Pernell* (1979), 72 Ill. App. 3d 664, 391 N.E.2d 85, to support his contentions.

In *Pernell,* where the defendant was convicted of murder, IPI Criminal No. 7.02, defining murder, and IPI Criminal No. 24.06, defining justifiable use of force, were given. Nevertheless, the court held that because the issue of self-defense was properly raised, it was error not to give IPI Criminal No. 25.05 even though not tendered, because these other instructions did not inform the jury that the State had the burden of proving beyond a reasonable doubt that defendant was not justified in using the force which he used. Also, in *People v. Martinez* (1979), 76 Ill. App. 3d 280, 395 N.E.2d 86, where the defendant was convicted of attempt murder, IPI Criminal No. 6.07, defining attempt, IPI Criminal No. 24.06 and IPI Criminal No. 2.03, the general instruction on the State's burden of proof, were given. The court held that IPI Criminal No. 25.05 also should have been given.

■■ Based on the holdings in *Pernell* and *Martinez*, we agree with defendant that the instructions which the State here relies on cannot be considered sufficient to have informed the jury that the State had the burden of proving beyond a reasonable doubt that defendant's use of force was not justified as self-defense.

Defendant, however, while objecting at trial that IPI Criminal No. 7.01, defining murder, should have included the words "without justification," never tendered IPI Criminal No. 25.05 to the trial court. Ordinarily, the defendant has the burden of submitting an instruction which bears favorably upon some phase of his defense (*People v. Bell* (1975), 27 Ill. App. 3d 171, 326 N.E.2d 507), and if defendant fails to tender such an instruction he waives the right to complain on appeal that the trial court did not give it. Ill. Rev. Stat. 1977, ch. 110A, par. 366(b)(2)(i); *People v. Bell* (1975), 27 Ill. App. 3d 171, 326 N.E.2d 507.

Defendant urges that in *Pernell* and *Martinez* the respective defendants did not tender IPI Criminal No. 25.05. In each case the court held that the trial court's failure to give IPI Criminal No. 25.05 was plain error, requiring reversal of the respective defendants' convictions. Defendant contends that the trial court failure here to give IPI Criminal No. 25.05 was also plain error and that the waiver rule should not apply.

We agree with the decisions in *Pernell* and *Martinez* and believe that, generally, when the issue of self-defense is properly raised, failure to give IPI Criminal No. 25.05 is plain error. However, in the present case we do not feel that the failure to give IPI Criminal No. 25.05 was plain error.

■■ ■ A court of review, in deciding whether to exercise its discretion to consider an error otherwise waived as plain error (Ill. Rev. Stat. 1977,

ch. 110A, pars. 451(c), 615(a)) may consider as a pivotal factor the closeness of the evidence. (*People v. Stinnette* (1977), 49 Ill. App. 3d 134, 363 N.E.2d 945.) The issue of self-defense may have been raised here by the evidence, since only slight evidence is necessary to raise such a defense. (*People v. Brown* (1971), 132 Ill. App. 2d 875, 271 N.E.2d 395.) However, there was more than sufficient evidence here to prove beyond a reasonable doubt that defendant was not acting in self-defense when he shot Taylor. We hold, therefore, that the failure to give IPI Criminal No. 25.05 was not plain error and that the failure to give it was waived by the failure to tender it.

■■ Defendant also contends that his 1975 conviction for delivery of a controlled substance was improperly admitted against him at trial. The State argues that defendant's prior conviction was properly admitted as impeachment evidence. In *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, the supreme court held that evidence of a prior conviction may be admitted to impeach a witness when the following three conditions are met: (1) the prior conviction was punishable by death or imprisonment in excess of one year, or was a crime involving dishonesty or false statements; (2) the date of conviction or the date of release of the witness from confinement, whichever is later, is not more than 10 years prior to the trial; and (3) the trial court in its discretion must determine that the probative value for impeachment purposes of the prior conviction outweighs any unfair prejudice its admission may have for the defendant.

■■ Factors which a trial court may consider in deciding whether the probative value of a prior conviction for impeachment outweighs the risk of prejudice include the nature of the prior crime, the likelihood that the defendant would not testify if his motion to exclude the prior conviction is denied, and whether the prior crime is similar to the one charged. *People v. Dee* (1975), 26 Ill. App. 3d 691, 325 N.E.2d 336.

There was no similarity between defendant's prior conviction for delivery of a controlled substance and the crimes with which defendant was charged, attempt murder, unlawful use of weapons and aggravated battery. Also, defendant testified; obviously he was not discouraged from testifying by the trial court's refusal to exclude his prior conviction as impeachment evidence.

■■ Defendant contends, nevertheless, that his prior conviction was for a crime which does not involve dishonesty and, therefore, it should not have been admitted as impeachment evidence. However, prior convictions for crimes other than for an offense based on dishonesty or false statements have been held admissible as impeachment evidence. (*People v. Kitchen* (1977), 53 Ill. App. 3d 521, 368 N.E.2d 528.) In *People v. Nelson* (1975), 31 Ill. App. 3d 934, 335 N.E.2d 79, the defendant's prior

conviction for possession of heroin was held admissible on the theory that it indicated a disposition on the defendant's part "to place the advancement of individual self-interest ahead of principle or the interest of society, and such proof may suggest a willingness to do so again on the witness stand." (*Nelson*, at 938.) The same rationale, applied here, supports the trial court's decision to admit defendant's prior conviction. ■■ We hold the trial court did not abuse its discretion by admitting defendant's prior conviction as impeachment evidence. In any event, the admission of defendant's prior conviction was harmless, in view of the strong evidence of defendant's guilt and the dissimilarity between the prior crime and the crimes with which defendant was charged in the present case.

■■ Defendant finally contends that his sentence of 20 to 35 years for attempt murder should be reversed and remanded for reconsideration. Defendant committed the offense on September 27, 1976, and was sentenced on August 25, 1978. A defendant sentenced after February 1, 1978, has the right to elect to be sentenced under the new Unified Code of Corrections of 1977 (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1008—2—4(b)), or under the law which was in effect at the time the offense was committed. Defendant elected to be sentenced under the prior law. The trial court misinformed defendant that under that law the minimum sentence for attempt murder was four years. The prior statute (Ill. Rev. Stat. 1975, ch. 38, par. 8—4(c)) actually does not prescribe a minimum sentence for attempt murder. (*People v. Moore* (1978), 69 Ill. 2d 520, 372 N.E.2d 666.) Defendant contends that because of this error his sentence for attempt murder should be reversed and the cause remanded for reconsideration. We disagree. While a trial judge may feel obliged to explain the prior and new sentencing provisions to a defendant before a defendant elects which provisions he wishes applied, "there is no requirement—statutory, decisional, or by rule—that the election be knowing and intelligent, nor that such election constitutes a waiver of a constitutional right, nor that the sentencing judge must explain the variances between the alternative acts, nor that the trial court admonish him as to what will or might be his best or most advantageous choice, nor that the trial judge must tell him in advance of election what the sentence *will* be under each act." (*People v. Dozier* (1979), 67 Ill. App. 3d 611, 615, 385 N.E.2d 155.) Thus, "all that is required * * * is that the trial judge advise a defendant of his right to election. The burden is not for the court but for counsel to explain and suggest what appears to be the best choice." (*People v. Warfel* (1979), 67 Ill. App. 3d 620, 627, 385 N.E.2d 175.) Moreover, in those cases in which a defendant's sentence for attempt murder under the old law was remanded for reconsideration because of the court's misapprehension as to the correct minimum

sentence (*People v. Woods* (1978), 62 Ill. App. 3d 381, 378 N.E.2d 1271; *People v. Brooks* (1977), 50 Ill. App. 3d 4, 364 N.E.2d 994; *People v. Athey* (1976), 43 Ill. App. 3d 261, 356 N.E.2d 1332), the minimum which the trial court actually had imposed was four years, or not too many more than four. The trial judge here considered the seriousness of defendant's crime, including the extent of permanent injuries suffered by Taylor, as well as defendant's background and prospects for rehabilitation, and felt it necessary to impose a sentence for attempt murder with a high minimum and maximum term, 20 to 35 years. We think it is clear that the trial judge would have imposed the same sentence even if he had not mistakenly believed attempt murder carried a four year minimum sentence.

The convictions and sentences are affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.